UNITED SPINAL ASSOCIATION, a nonprofit organization, Disabled In Action, a nonprofit organization, Plaintiffs,

v.

BOARD OF ELECTIONS IN THE CITY OF NEW YORK and Julie Dent, in her official capacity as President of the Board of Elections in the City of New York, Defendants.

No. 10 Civ. 5653(DAB).

United States District Court, S.D. New York.

Aug. 8, 2012.

Julia Miriam Pinover, Ronald Elsberry, Sid Wolinsky, Stuart John Seaborn, Disability Rights Advocates, Kevin Todd Mintzer, Kevin Mintzer, P.C., Mariann Meier Wang, Cuti Hecker Wang LLP., New York, NY, for Plaintiffs.

Stephen Edward Kitzinger, New York, NY, for Defendants.

### MEMORANDUM & ORDER

DEBORAH A. BATTS, District Judge.

Plaintiffs United Spinal Association and Disabled in Action bring this action for

declaratory and injunctive relief pursuant to Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, et seq. and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, et seq., to remedy what they allege are pervasive and persistent access barriers at poll sites operated by the Board of Elections in the City of New York (the "BOE"). On October 28, 2010, after finding that Plaintiffs could not meet the stringent standard of showing a substantial likelihood of success on the merits required for a mandatory injunction, this Court denied Plaintiffs' Motion for a Preliminary Injunction.

Plaintiffs now move for summary judgment on the issue of Defendants' liability for violations of Title II of the ADA and Section 504. Defendants cross-move for summary judgment on Plaintiffs' claims. For the reasons set forth herein, Plaintiffs' Motion for Summary Judgment is GRANTED, and Defendants' Motion for Summary Judgment is DENIED.

## I. BACKGROUND

Unless otherwise noted, the following facts are undisputed.

The United States Census Bureau's 2010 American Community Survey 1–Year estimates that, among the non-institutionalized people in New York City ages 18–64, 67,000 persons have vision difficulties and 222,469 persons have ambulatory difficulties. (Pls.' 56.1 Stmt., ¶ 132.) Among the non-institutionalized population in New York City ages 65 and over, 78,502 persons have a vision difficulty and 267,563 persons have an ambulatory difficulty. (Id., ¶ 133.)

### A. The Parties

Organizational Plaintiffs United Spinal Association ("United Spinal") and Disabled In Action ("DIA") are membership organizations that consist of people with mobility and/or vision disabilities who reside in New York City and are registered to vote. (Pls.' 56.1 Stmt., ¶ 134.) United Spinal is a nonprofit disability rights and veterans service organization whose mission is to provide expertise, create access to resources, and strengthen hope, thereby enabling people with spinal cord injuries and disorders to fulfill their potential as active members of their communities. (Id., ¶ 135.) United Spinal engages in voting advocacy on behalf of its members, including advocacy campaigns for accessible polling places, participating in legislative processes regarding voting issues, and educating its members on their voting rights. (Id., ¶ 136.) Almost 1,000 members of United Spinal reside in New York City. Many members are registered voters with disabilities who have encountered obstacles, or are at risk of encountering obstacles, at their polling places in New York City. (Id., ¶ 137.)

DIA is a nonprofit civil rights organization committed to ending discrimination against people with disabilities, which consists primarily of, and is directed by, people with disabilities. (Id., ¶ 140.) The majority of DIA members are wheelchair users or those who have mobility disabilities. DIA has approximately 200 members in the metropolitan New York region, many of whom are registered voters with disabilities who have encountered obstacles, or are at risk of encountering obstacles, at their polling places in New York City. (Id., ¶ 141.)

The BOE is responsible for identifying and designating poll sites that are accessible to voters with disabilities throughout New York City. (Pls.' 56.1 Stmt., ¶ 2.) Pursuant to the Help America Vote Act ("HAVA"), the BOE received federal funds from which it was authorized to make, and did make, expenditures. The federal

grant was approximately $1.6 million. (*Id.,* ¶ 3.)

## B. *CIDNY and Poll–Site Accessibility Surveys*

Under HAVA, the Protection and Advocacy for Voter Access ("PAVA") program was established by the New York State Commission on Quality of Care and Advocacy for Persons with Disabilities to ensure the full participation of individuals with disabilities in the electoral process. The Center for Independence of the Disabled, New York ("CIDNY") is the downstate regional PAVA office. (*Id.,* ¶ 5.) Rima McCoy, who served as Voting Rights Coordinator for CIDNY from July 2008 until December 16, 2011, states that

> [w]hat appears to be a small barrier to the untrained eye, may actually be prohibitively embarrassing, uncomfortable, or arduous for a person with a disability to overcome. For example, where there is no signage to an accessible entrance, a person in a wheelchair may find themselves stranded and wandering down back alleys, searching for an accessible way inside. If there is rain, this situation is uncomfortable. If it is night time, this may not be safe. If the person's disability causes them to be fatigued quickly, this may be arduous at best. When a person is forced to cast a ballot on the sidewalk, it is humiliating and deeply alienating. These barriers not only impede access in the moment someone is voting, but also cast a chill on people with disabilities' willingness to participate in future elections and confront the same kind of discriminatory and humiliating treatment.

(McCoy Decl., ¶ 19.)

The Department of Justice ("DOJ") has created an ADA Checklist for Polling Places for poll-site accessibility. (Pls.' 56.1 Stmt., ¶ 11.) CIDNY has been inspecting poll sites for accessibility since at least 2008. Inspections have been conducted by CIDNY staff and volunteers using a form checklist based on the DOJ ADA Checklist for Polling Places. (*Id.,* ¶ 12; Defs.' Resp. Pls.' 56.1 Stmt., ¶ 12.) The DOJ Checklist "is designed to help voting officials determine whether a polling place has basic accessible features needed by most voters with disabilities." (McCoy Decl. Ex. A, p. 4.) The Checklist states that "[i]ndividuals completing the checklist do not necessarily need to be experienced in evaluating buildings and facilities for accessibility." (*Id.*) In fact, the only special equipment necessary for completion of the checklist is a metal tape measure at least 15–feet long and a level with a bubble measure or digital measure at least twenty-four inches long. (*Id.,* p. 5.) The DOJ Checklist prompts the user to check that sidewalks and walkways are free from objects that could impede blind or mobility-impaired voters, that ramps are wide-enough and do not have excessive slope, that accessible entrances are marked with appropriate signage when the main entrance to the poll site is not accessible, that doors at the accessible entrance provide sufficient clearance and are propped open if they cannot be opened easily, and that the route through the voting area is sufficiently wide. (*See generally, id.*)

CIDNY inspectors were trained on how to use levels and measuring tapes to identify the existence and severity of barriers at polling sites. Trainees practiced using a level to take slope measurements and viewed illustrations, photos, and props to simulate barriers. (McCoy Decl., ¶ 23.) CIDNY generally selects poll sites to inspect based on complaints from consumers or availability of inspectors. For the September 2010 and November 2011 elections, CIDNY surveyed a random sample of poll

sites identified by an expert statistician for Disability Rights Advocates. (*Id.*, ¶ 25.)

CIDNY has summarized the data from poll-site accessibility checklists and created summary spreadsheets for at least the 2008 through 2011 elections. (Pls.' 56.1 Stmt., ¶ 25.) CIDNY submits these summary spreadsheets to the BOE every year. (*Id.*) In its 2011 Poll Worker's Manual on Disability Awareness, the BOE stated that "Each year, CIDNY ... finds large objects obstructing pathways at Poll Sites." (Seaborn Decl. Ex. E, p. 33.)

*C. November 2011 Surveys*

CIDNY surveyed poll sites during the General Election held on November 8, 2011. (Pls.' 56.1 Stmt., ¶ 33.) At P.S. 51, located at 87–45 117th Street in Queens, the ramp was only 33 inches wide and did not comply with DOJ Guidelines. (*Id.*, ¶ 36.) Defendants admit that the ramp is less than 3 6 inches wide, but state that the ramp is a permanent ramp and that Plaintiffs have not provided evidence that there is an alternative accessible site. (Defs.' Resp. Pls.' 56.1 Stmt., ¶ 36.) Plaintiffs also state that there was no sign at the inaccessible main entrance to P.S. 51 indicating the location of the accessible entrance. (Pls.' 56.1 Stmt., ¶ 37.) Defendants state that they have a policy of placing appropriate signage, and if there was a problem with the signage at P.S. 51, Defendants were not notified of it. (Defs.' Resp. Pls.' 56.1 Stmt., ¶ 37.) Plaintiffs also state that the Ballot Marking Device ("BMD") was positioned too close to the wall so that there was not enough space for a wheelchair user to access it. (Pls.' 56.1 Stmt., ¶ 38,) Defendants state that they have a policy of placing voting equipment so that it is accessible, and if the equipment was improperly placed, Defendants were never notified of it. (Defs.' Resp. Pls.' 56.1 Stmt., ¶ 38.)

At P.S. 175, located at 64–35 102nd Street in Queens, the BMD was placed facing towards the interior of the room, which meant that users would not have privacy. (Pls.' 56.1. Stmt., ¶ 39.) Defendants state that they have a policy of placing BMDs to allow for privacy, and if the machine was placed improperly, they were not made aware of it. (Defs.' Resp. Pls.' 56.1 Stmt., ¶ 39.)

At P.S. 99, located at 82–37 Kew Gardens Road in Queens, CIDNY surveyors found that the voting area did not have the 36 inch pathway needed for wheelchair users in many places and that the ADA privacy booth was improperly placed. (Pls.' 56.1 Stmt., ¶ 40.) Defendants state that the BOE has a policy of placing voting equipment in an accessible manner, and if the equipment was improperly placed, they were not notified of it. (Defs.' Resp. Pls.' 56.1 Stmt., ¶ 40.)

At P.S. 190, located at 68–17 Austin Street in Queens, CIDNY surveyors noted a door that was "very heavy" and an automatic door opener that did not work, along with an improperly placed BMD. (Pls.' 56.1 Stmt., ¶¶ 41–42.) Defendants state that they were not made aware that the automatic door opener did not work and that the BMD was repositioned once a poll worker was made aware of the inaccessible placement. (Defs.' Resp. Pls.' 56.1 Stmt., ¶¶ 41–42.)

CIDNY surveyors recorded similar problems at several other poll sites during the November 2011 General Election, including at Los Tres Unidos HUD residence, located at 22 East 112th Street in Manhattan (inadequate signage, door saddle/lip higher than 1 inch, objects obstructing pathways in the voting area), 1199 HUD residence located at 420 East 111th Street in Manhattan (doorway too small, inaccessible buzzer at entrance), P.S. 19, located at 40–32 99th Street in Queens (no

sign and locked door at accessible entrance, furniture blocking interior pathway), P.S. 127, located at 98–01 25th Avenue in Queens (furniture blocking access at top of ramp), Taiwan Center, located at 137–44 Northern Boulevard in Queens (steep ramp without landing or handrails, BMD improperly placed), and Flushing House, located at 3820 Borne Street in Queens (BMD and ADA privacy booth improperly placed). (Pls.' 56.1 Stmt., ¶¶ 45–56.) Defendants contend that with these sites, as with the others, that Plaintiffs have failed to suggest alternative sites and that Defendants were not told about problems that could have been corrected during voting. (Defs.' Resp. Pls.' 56.1 Stmt., ¶¶ 45–56.)

### D. September 2010 Surveys

During the September 2010 Primary Election, CIDNY surveyors inspected 53 poll sites out of the 628 poll sites in Manhattan and Queens used in that election. (Pls.' 56.1. Stmt., ¶¶ 62–63.) At P.S. 196, located at 71–25 113th Street in Queens, the accessible entrance was around a long block from the inaccessible entrance, and inside the voting area, a table obstructed the pathway to the BMD. (*Id.* ¶ 64.) At P.S. 13, located at 55–01 94th Street, there was no sign at the inaccessible main entrance to direct voters to the accessible entrance. The door to the accessible entrance was locked and the bell did not work. Once inside, there was no signage to direct voters to take the elevator up to the voting area or to inform voters of which floor the voting area was located on. Once inside the voting area, the ADA privacy booth was placed so that it was inaccessible. (*Id.*, ¶ 66.)

At VFW Post 2477, located at 89–07 Astoria Boulevard in Queens, the ramp was actually "two ramps put together" and was so steep that the CIDNY surveyor, Ramon Santos, "almost fell backward." (Pls.' 56.1 Stmt., ¶ 68.)

During the September 2010 election, Denise McQuade, who uses a wheelchair, went to vote at her polling place located at P.S. 102 in Bay Ridge, Brooklyn. (*Id.*, ¶ 69.) When Ms. McQuade and her husband arrived at P.S. 102, they went to the rear of the building to enter the polling place through the accessible entrance. Upon opening a door, they saw "an extremely steep ramp-like a ski slope" that "appeared to be made of concrete and to be a permanent part of the building." Ms. McQuade was "very frightened to use the ramp because there was no landing at the top of the ramp and this would make [it] impossible for us to exit safely without assistance." (*Id.*, ¶ 70.) To enter P.S. 102, Ms. McQuade's husband had to push her wheelchair against the door, which opened inward, to enter. Immediately upon crossing the threshold of the entrance, her husband had to pull back on the handles of her wheelchair to keep her wheelchair "from plunging down the ramp at breakneck speed." (*Id.*, ¶ 71.) After voting, Ms. McQuade had to ask a policeman on duty for assistance in opening the door, because the door opened inward and there was no landing. It would have been impossible for her husband to hold her wheelchair in place on the ramp and open the door. There was no poll monitor to assist Ms. McQuade. (*Id.*, ¶ 72.) After this experience at P.S. 102, Ms. McQuade was afraid to go back to vote during subsequent elections and "decided it would be safer for [her] to use an absentee ballot, than to try to enter the polling place again" even though she prefers to vote alongside her neighbors and community. (*Id.*, ¶ 73.) Ms. McQuade used an absentee ballot during the November 2011 election because of the barriers encountered in September 2010. (*Id.*, ¶ 74.)

The ramp at P.S. 102 is located at the only accessible entrance to the facility. Ms. McCoy measured the slope of the ramp and found that it was "significantly steeper than 1:12, which is what is required by the ADA." (Pls.' 56.1 Stmt., ¶ 75.) Ms. McCoy suggested two alternative poll sites to replace P.S. 102, namely, Xaverian High School and the Bay Ridge Public Library. (*Id.*, ¶ 76.) Despite the BOE having knowledge regarding the ramp that was not ADA compliant at P.S. 102, that site was used again as a polling place during the November 2011 election. (Pls.' 56.1 Stmt., ¶ 77.) Defendants admit as much, but state that the facility is scheduled to be made accessible in the near future and that no other facility has been determined to meet the BOE's needs. In the interim, the BOE has notified all voters who are assigned to that poll site and offered to transfer their registration to an accessible poll site. (Defs.' Resp. Pls.' 56.1 Stmt., ¶ 77.) Defendants do not state when they expect P.S. 102 will be made accessible or what efforts they have made to find an alternative poll site.

*E.  November 2010 Surveys*

During the November 2010 General Election, CIDNY inspected 53 polling places. (Pls.' 56.1 Stmt., ¶ 78.) At P.S. 146, located at 98–01 159th Avenue in Queens, the slope of the ramp was steeper than the maximum 1:12 allowed. (*Id.*, ¶ 79.) At Sarasota Gold, located at 711 Seagirt Avenue, the BMD was placed four feet from the wall, making it extremely difficult for someone using a wheelchair or scooter to access the machine. (*Id.*, ¶ 80.)

*F.  BOE Surveys of Poll Sites, Site Selection, and Monitoring*

The BOE currently employs 25 full-time surveyors, each of whom was trained and certified as competent to conduct poll site surveys by CIDNY. (Defs.' 56.1 Stmt., ¶ 4.) The BOE previously determined that two poll sites were fully inaccessible. Those sites are P.S. 119 in Brooklyn and P.S. 2 in Queens. Further surveying has revealed other sites that do not fully meet accessibility standards. (Defs.' 56.1 Stmt., ¶ 6.) Poll sites in the Bronx at 1591 Metropolitan Store Room and 2051 St. Raymonds Avenue were used in the November 2011 election. (Pls.' 56.1 Stmt., ¶ 57.) The BOE's surveyors at 1591 Metropolitan Store Room determined that the ramp was not ADA compliant because it had no handrails on the second ramp and a dangerous wood platform. (*Id.*, ¶ 59.) The BOE's surveyors at 2051 St. Raymonds Avenue determined that the ramp at that site was not ADA compliant because it had no landings or top platform. (*Id.*, ¶ 60.)

The Board of Elections does not have an ADA coordinator or person designated as having primary responsibility for ensuring compliance with the ADA, as required by 28 C.F.R. 35.107. (Pls.' 56.1 Stmt., ¶ 85.) The BOE does not have an Accessibility Transition Plan or Written Plan pursuant to 28 C.F.R. 35.150(d). (*Id.*, ¶ 86.)

A number of Board of Education sites (i.e., public schools) that are used as poll sites are not architecturally and structurally fully compliant with the ADA. (*Id.*, ¶ 88.) Defendants contend that such sites are made compliant to the greatest extent possible using temporary measures, and Plaintiffs have not suggested alternative sites to replace the inaccessible ones. (Defs.' Resp. Pls.' 56.1 Stmt., ¶ 88.) The BOE is not precluded from using private sites for polling places. Private sites receive a $70 stipend and can enter into lease agreements with the BOE to allow use as polling sites. (Pls.' 56.1 Stmt., ¶ 93.) The BOE has a surveyor team that is responsible for searching for fully accessible voting sites as substitutes for sites

that are inaccessible. (*Id.*, ¶ 95.) The State Board of Elections designated CID-NY as the entity to provide training and to certify BOE site surveyors as qualified. (Defs.' Resp. Pls.' 56.1 Stmt., ¶ 98.)

On Election Day, the BOE is notified of some access barriers that arise at polling places and keeps track of these complaints. Examples of recent complaints in the November 2010 election include the absence of temporary ramps or ramp parts and the general inaccessibility of a site. (Pls.' 56.1 Stmt., ¶ 104.) Defendants' Call Incident Logs often fail to indicate that any action was taken in response to a complaint. In November 2010, Defendants received a complaint that P.S. 164 in Queens needed a ramp. The Call Incident Log does not indicate that Defendants ever responded to this complaint. (Pls.' 56.1 Stmt., ¶ 106.) That same election, P.S. 153 in Manhattan was reported as "no ramp, no access." Again, Defendants Call Incident Log does not indicate that any action was taken. (*Id.*, ¶ 108.)

During the November 2011 election, two complaints regarding the BMD machines were made to the BOE regarding the Selis Manor poll site located at 135 West 23rd Street in Manhattan. (*Id.*, ¶ 115.) Selis Manor is a HUD building which consists of around 200 apartments and over 300 residents. Around 90% of the residents are blind and 10% are mobility impaired. Selis Manor should have two BMD machines. (*Id.*, ¶ 116.)

Paula Wolff, President of Plaintiff DIA, votes at Selis Manor. When Ms. Wolff voted in 2011, at around 7:00 p.m., there was only one BMD machine at the site, the machine was not functioning, and poll workers were not trained properly on how to work the machine. (*Id.*, ¶ 117.) BOE reports indicate that a call complaining about the BMD machine came in at 2:46 p.m., but that no one from BOE was dis-patched and the machine was never repaired. (*Id.*, ¶ 119.) The poll worker had to read the ballots to residents voting at Selis Manor and the voters told the poll worker who they were voting for, thereby denying voters with vision impairments the opportunity to vote independently. (Pls.' 56.1 Stmt., ¶ 120.)

## II. DISCUSSION

### A. Summary Judgment Standard

A district court should grant summary judgment when there is "no genuine dispute as to any material fact," and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *see also Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir.2005). Genuine issues of material fact cannot be created by mere conclusory allegations. *Victor v. Milicevic*, 361 Fed.Appx. 212, 214 (2d Cir.2010). Summary judgment is appropriate only when, after drawing all reasonable inferences in favor of a non-movant, no reasonable trier of fact could find in favor of that party. *Melendez v. Mitchell*, 394 Fed. Appx. 739, 740 (2d Cir.2010).

In assessing when summary judgment should be granted, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* (citing *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir.2005)). The non-movant may not rely upon speculation and/or conjecture to overcome a motion for summary judgment. *Burgess v. Fairport Cent. Sch. Dist.*, 371 Fed.Appx. 140, 141 (2d Cir.2010). Instead, when the moving party has documented particular facts in the record, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *FDIC v. Great Am. Ins.*

*Co.,* 607 F.3d 288, 292 (2d Cir.2010) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Establishing such evidence requires going beyond the allegations of the pleadings, as the moment has arrived "to put up or shut up." *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000). Thus, unsupported allegations in the pleadings cannot create a material issue of fact. *Id.*

A court faced with cross-motions for summary judgment need not "grant judgment as a matter of law for one side or the other," but " 'must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.' " *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993) (*quoting Schwabenbauer v. Bd. of Educ. of Olean,* 667 F.2d 305, 313–14 (2d Cir.1981)).

### B. ADA and Section 504 Claims

■ Under Subtitle A of Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). In this Circuit, plaintiffs establish a *prima facie* violation of Title II when they show that; (1) plaintiffs are "qualified individuals" with a disability; (2) defendants are subject to

the ADA; and (3) plaintiffs were denied the opportunity either to participate in or to benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiffs' disabilities. *Henrietta D. v. Bloomberg,* 331 F.3d 261, 272 (2d Cir. 2003). For purposes of Section 504, Plaintiffs must also establish that Defendants are recipients of federal funds. *Id.* at 272. The only element at issue here is element three, namely, whether Plaintiffs have shown sufficiently that they were denied the opportunity to participate in or benefit from Defendants' voting program by reason of their disabilities.

■ Defendants first argue that Plaintiffs' claims must fail as there is no evidence that any voter has actually been deprived of the right to participate in an election. (Defs.' Mem. L. Supp. Mot. Dismiss, p. 10.) This interpretation, which would demand that an individual was actually deprived of the right to cast a ballot, is overly broad and unsupported by any precedent. It is abundantly clear that Defendants are obligated to provide a level of access to their voting program beyond the simple assurance that voters with disabilities are able to cast a ballot in some way, shape, or form.

■ Regulations promulgated by the DOJ to implement the ADA provide that "[a] public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150. It is well-established in this Circuit that although the ADA and its implementing regulations do not require "equal access" or "equal results" for individuals with disabilities, those individuals must be provided with "meaningful access" to a public entities programs and activities. *See Civic Ass'n of the Deaf of New York*

*City, Inc. v. City of New York,* No. 95 Civ. 8591, 2011 WL 5995182, at \*9 (S.D.N.Y. Nov. 29, 2011) (finding that a "meaningful access" rather than an "equal access" or "equal results" standard applied to ADA and Section 504 claims); *see also Henrietta D.,* 331 F.3d at 275 (finding that the measure is "whether the plaintiffs with disabilities could achieve meaningful access, and not whether the access the plaintiffs had (absent a remedy) was *less* meaningful than what was enjoyed by others.") (emphasis in original).

In the voting context, another court in this District has found that "[f]ailing to ensure that disabled individuals are able to vote in person and at their assigned polling places—presumably the most commonly used method of voting—could not reasonably be construed as consistent with providing 'meaningful access' to the voting process." *Westchester Disabled on the Move, Inc. v. County of Westchester,* 346 F.Supp.2d 473, 478 (S.D.N.Y.2004); *see also Kerrigan v. Philadelphia Board of Election,* No. 07 Civ. 687, 2008 WL 3562521, at \*17–\*18 (E.D.Pa. Aug. 14, 2008) (finding voting by absentee ballot or by emergency ballot at city hall an inadequate substitute for mobility-impaired voters who encountered barriers at their assigned polling places on election day). It is no excuse that the BOE does not own the locations used as poll sites on election days, as the ADA Title II Technical Assistance Manual also provides guidance on leased spaces:

> Public entities are encouraged, but not required, to lease accessible space. The availability of accessible private commercial space will steadily increase over time as the title III requirements for new construction and alterations take effect. Although a public entity is not required to lease accessible space, once it occupies a facility, it must provide access to all of the programs conducted

in that space.... Thus, the more accessible a space is to begin with, the easier and less costly it will be later on to make programs available to individuals with disabilities and to provide reasonable accommodations for employees who may need them.

The Americans with Disabilities Act Title II Technical Assistance Manual, § II–6.4000 (available at http://www.ada.gov/taman2.html) (last visited July 2, 2012).

This Court finds that there is no genuine dispute of material fact as to the existence of pervasive and recurring barriers to accessibility on election days at poll sites designated by the BOE. Plaintiffs, through the use of CIDNY surveys, have provided copious documentation of barriers at poll sites, ranging from ramps that are unsafe or missing to missing signage and improper placement of voting equipment and furniture in voting areas. Defendants themselves admit that more than two poll sites do not meet accessibility standards. (Defs.' Mem. L. Supp. Mot. Dismiss, p. 4.)

Nevertheless, the ADA does not, as Plaintiffs seem to suggest, require perfection. *See, e.g., Westchester Disabled on the Move,* 346 F.Supp.2d at 480 (denying a motion for a preliminary injunction where the court found it unlikely that enough accessible structures existed and where modifications to existing structures would be "difficult, if not impossible" for the defendant board of elections to make alone); *New York v. County of Delaware,* 82 F.Supp.2d 12, 18 (N.D.N.Y.2000) (recognizing that certain changes necessary to make poll sites fully accessible were not "feasible"); *Hill v. New York State Board of Elections,* 120 A.D.2d 55, 57, 507 N.Y.S.2d 674 (N.Y.2d Dep't 1986) (recognizing that the extent to which polling places must be made accessible involves "matters of administrative judgment, dis-

cretion and allocation of resources and priorities"). The ADA'S implementing regulations themselves contemplate some flexibility. 28 C.F.R. § 35.150, which governs existing facilities, states:

(a) General. A public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities. This paragraph does not—

(1) Necessarily require a public entity to make each of its existing facilities accessible to and usable by individuals with disabilities;

(2) Require a public entity to take any action that would threaten or destroy the historic significance of an historic property; or

(3) Require a public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens. In those circumstances where personnel of the public entity believe that the proposed action would fundamentally alter the service, program, or activity or would result in undue financial and administrative burdens, a public entity has the burden of proving that compliance with § 35.150(a) of this part would result in such alteration or burdens. The decision that compliance would result in such alteration or burdens must be made by the head of a public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity, and must be accompanied by a written statement of the reasons for reaching that conclusion. If an action would result in such an alteration or such burdens, a public entity shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that individuals with disabilities receive the benefits or services provided by the public entity.

(b) Methods—

(1) General. A public entity may comply with the requirements of this section through such means as redesign or acquisition of equipment, reassignment of services to accessible buildings, assignment of aides to beneficiaries, home visits, delivery of services at alternate accessible sites, alteration of existing facilities and construction of new facilities, use of accessible rolling stock or other conveyances, or any other methods that result in making its services, programs, or activities readily accessible to and usable by individuals with disabilities. A public entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance with this section. A public entity, in making alterations to existing buildings, shall meet the accessibility requirements of § 35.151. In choosing among available methods for meeting the requirements of this section, a public entity shall give priority to those methods that offer services, programs, and activities to qualified individuals with disabilities in the most integrated setting appropriate.

28 C.F.R. § 35.150.

Likewise, the Rehabilitation Act's implementing regulations also provide:

(a) A recipient shall operate each program or activity so that the program or activity, when viewed in its entirety, is readily accessible to and usable by handicapped persons. This paragraph does not necessarily require a recipient to make each of its existing facilities or every part of an existing facility accessi-

ble to and usable by handicapped persons.

■ Accordingly, it is not self-evident, as Plaintiffs claim, that a violation of Title II or Section 504 of the Rehabilitation Act necessarily follows when the BOE designates a poll site that is less than ideally accessible, or when, over the course of an election day, conditions arise that may render an otherwise accessible poll site inaccessible in some way. Rather, to demonstrate that individuals were deprived of an opportunity or benefit or discriminated against *by reason* of their disabilities, Plaintiffs must demonstrate that Defendants failed to undertake some feasible measure to improve accessibility or, in other words, that Defendants failed to provide disabled voters with reasonable accommodations. *See Henrietta D. v. Bloomberg*, 331 F.3d at 279 ("In so interpreting the 'by reason of ... disability' requirement, we are mindful of the fact that Title II seeks principally to ensure that disabilities do not prevent access to public service where the disabilities can reasonably be accommodated."); *see also Kerrigan*, 2008 WL 3562521, at *10 ("If Plaintiffs are able to make a prima facie showing of discrimination in violation of the ADA and RA, they have the additional burden 'of articulating reasonable accommodations that the defendant can make in order to comply with the ADA and the RA.'") (citing *Liberty Res. Inc. v. Philadelphia Hous. Auth.*, 528 F.Supp.2d 553, 565 (E.D.Pa.2007)).

This burden, however, is hardly insurmountable. "It is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits and that once the plaintiff has done this, she has made out a prima facie showing that a reasonable accommodation is available, and the risk of nonpersuasion falls on the defendant." *Henrietta D.*, 331 F.3d at 280; *C.D. v. New York City Dept. of Educ.*, No. 05 Civ. 7945, 2009 WL 400382, at *7 (S.D.N.Y. Feb. 11, 2009) ("A reasonable accommodation is one that does not 'impose an undue hardship on the operation of [a] program or activity.'") (quoting 45 C.F.R. § 84.12(a)).

Accordingly, summary judgment would be inappropriate at this stage if there were a genuine dispute of material fact as to whether Defendants accommodate voters with vision and mobility-related impairments. This Court finds that there is none.

Defendants allege that they accommodate voters with disabilities in essentially two ways; by offering voters assigned to inaccessible poll sites the opportunity to have their registration transferred to a nearby accessible poll site; and by addressing other barriers, such as inadequate signage or inappropriately-placed furniture, as they are made aware of those barriers, either through complaints or through their own monitoring process. The evidence shows, however, that both of these methods fall short.

Defendants claim that voters assigned to P.S. 119 in Brooklyn and P.S. 2 in Queens are given the opportunity to have their registration transferred to a nearby accessible site. (Defs.' Mem. L. Supp. Mot. Dismiss, p. 4.) By Defendants' own admission, however, P.S. 119 and P.S. 2 are not the only sites that are fully inaccessible due to aspects of building construction that cannot be remedied by temporary measures on election days. (*See, id.*) The BOE fails to identify which other sites its surveys have revealed to be inaccessible, and does not make any representation that voters at those sites have been notified and offered the opportunity to have their registration transferred. Furthermore, Defendants have presented no evidence regard-

ing their attempts to locate alternative poll sites to replace sites that are inaccessible.

Defendants concede that Rima McCoy suggested two alternative poll sites to replace P.S. 102 in Brooklyn, namely, Xaverian High School and Bay Ridge Public Library. (Defs.' Resp. Pls.' 56.1 Stmt., ¶ 76.) Nevertheless, they present no evidence that they ever evaluated these or any other sites as potential replacements. Instead, they claim that this suggestion is irrelevant in the absence of a representation from Ms. McCoy that her proposed sites are appropriate and available for use on election days. This Court declines to place such a burden on Plaintiffs in light of Defendants' utter failure to produce even a scintilla of evidence that they have evaluated these or any other sites in any way as potential replacements.

Defendants claim that poll workers are trained on accessibility issues, and that on election days, teams of monitors known as "AD Monitors" visit and inspect each poll site at least twice during the election day to check for accessibility issues, among other things. (Defs.' Mem. L. Supp. Mot. Dismiss, pp. 5–6.) It is clear, however, that no reasonable jury could find for Defendants on this point.

Plaintiffs have produced ample evidence of misplaced equipment and inadequate signage by poll workers that have reportedly been trained on accessibility issues, along with numerous reports from AD Monitors indicating that poll sites were not visited on election days, (see, Seaborn Decl. Ex. N), and calls to the BOE regarding accessibility issues with no resolution noted, (see Seaborn Decl. Ex. K). Defendants ask this Court to infer that if one AD Monitoring Team did not visit a poll site on election day, the poll site was visited by a different team, and that accessibility complaints were remedied even though no resolution was noted in the Call Inci-

dent Report. Even viewing the evidence in the light most favorable to Defendants, however, this Court simply cannot draw the inference Defendants advocate without a shred of evidence to support it. Defendants' evidence consists of mere unsupported assertions and conjecture that training is adequate and inspections are taking place. These bare assertions are insufficient to create a genuine dispute of material fact on this point. The only conclusion that may be drawn from the evidence submitted in the Parties' respective Motions for Summary Judgment is that the Defendants have failed to accommodate reasonably voters with disabilities.

Plaintiffs, as an accommodation, have suggested that Defendants identify one individual among on-site poll workers at each location to monitor poll-site accessibility. Furthermore, Plaintiffs suggest that the BOE partner with a third party, such as CIDNY, to assess and identify accessibility needs and possible solutions prior to the 2012 Presidential Election in November. (Pls.' Mem. L. Supp. Mot. Summ. J., pp. 24–25.) The costs of these accommodations, on their face, do not clearly exceed the benefits in light of the significant evidence of Defendants' failures to provide poll sites that are as accessible as reasonably feasible. Accordingly, summary judgment is granted for Plaintiffs as to liability for their Title II and Section 504 Rehabilitation Act claims.

### III. CONCLUSION

Plaintiffs' Motion for Summary Judgment is GRANTED;

Defendants' Motion for Summary Judgment is DENIED; and

The case is referred to the Honorable Henry Pitman, Magistrate Judge, for the

determination of remedy consistent with this Order.

SO ORDERED.