12-4412-cv
*Disabled in Action, et al. v. Bd. of Elections in the City of New York, et al.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————————

August Term 2013

(Argued:     December 12, 2013      Decided:     May 14, 2014)

Docket No. 12-4412-cv

———————————

DISABLED IN ACTION, a nonprofit organization,
UNITED SPINAL ASSOCIATION, a nonprofit organization,

*Plaintiffs-Appellees,*

v.

BOARD OF ELECTIONS IN THE CITY OF NEW YORK,
FREDERIC M. UMANE, in his official capacity as President of the Board of
Elections in the City of New York,

*Defendants-Appellants.*

———————————

Before:

CABRANES, HALL, and CHIN, *Circuit Judges.*

———————————

Appeal from a final order of the United States District Court for the Southern District of New York (Batts, *J.*), requiring defendants-appellants to comply with a comprehensive remedial plan to address barriers to access for people with disabilities at New York City polling sites. The order was entered after the district court granted summary judgment to plaintiffs-appellees, finding that defendants-appellants had violated Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act of 1990.

AFFIRMED.

———————————

STUART SEABORN, Disability Rights Advocates, Berkeley, CA (Sid Wolinsky and Christine Chuang, Disability Rights Advocates, Berkeley, CA, Julia Miriam Pinover, Disability Rights Advocates, New York, NY, Kevin Mintzer, The Law Office of Kevin Mintzer, P.C., New York, NY, and Mariann Meier Wang, Cuti Hecker Wang LLP, New York, NY, *on the brief*), *for Plaintiffs-Appellees.*

DRAKE A. COLLEY (Edward F.X. Hart, *on the brief*), *for* Michael A. Cardozo, Corporation Counsel of the City of New York, New York, NY, *for Defendants-Appellants.*

ALICIA M. SIMMONS, Assistant U.S. Attorney (Benjamin H. Torrance, Assistant U.S. Attorney, *on the brief*), *for* Preet Bharara, United States Attorney of the Southern District of New York, New York, NY,

and Jocelyn Samuels, Acting Assistant Attorney General (Dennis J. Dimsey and Sasha Samberg-Champion, Attorneys), Civil Rights Division, U.S. Department of Justice, *for Amicus Curiae United States of America*.

———————————

CHIN, *Circuit Judge*:

The Board of Elections in the City of New York (the "BOE") is responsible for identifying and designating poll sites that are accessible to voters with disabilities in New York City. In this case, plaintiffs-appellees, non-profit organizations representing people with mobility or vision disabilities (collectively "plaintiffs"), allege that BOE is failing to provide them with meaningful access to its voting program, in violation of Section 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act"), 29 U.S.C. § 794(a), and Title II of the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 12132.

The district court (Batts, *J.*) concluded that pervasive and recurring barriers to access exist at poll sites operated by BOE and granted plaintiffs' motion for summary judgment. After giving the parties the opportunity to develop and propose a joint plan for relief, the district court ordered a remedial plan to address BOE's violations of federal law. We conclude that the district court properly granted plaintiffs' motion for summary judgment. Moreover, we

find that the district court did not abuse its discretion in ordering the remedial plan. Accordingly, we affirm.

## STATEMENT OF THE CASE

### A. The Facts

As the district court noted, the facts set forth below are not in substantial dispute. *See United Spinal Ass'n v. Bd. of Elections in the City of New York*, 882 F. Supp. 2d 615, 617 (S.D.N.Y. 2012).[1]

### 1. New York Voting Laws

BOE is responsible for identifying and designating polling places that are accessible to voters with disabilities, and ensuring compliance with accessibility standards. N.Y. Elec. Law § 4-104(1). Under New York law, an individual with a disability may vote (1) in person on election day at her assigned polling place; (2) in person on election day at an alternative, accessible polling place, provided that the candidates and ballot proposals on the ballot at the alternative location are the same as those on the ballot at the assigned polling

---

[1] At oral argument, BOE confirmed that the facts are undisputed. Oral Argument at 2:54:27-2:55:17. Rather, defendants contest the inferences and conclusions the district court drew from these facts.

- 4 -

place; or (3) by absentee ballot if she is unable to appear at the assigned polling place. *Id.* §§ 5-601, 8-400(1)(b).

To vote at an alternative, accessible polling location, an individual must submit a written application to transfer her registration at least fourteen days before the election. *Id.* § 5-601(2). Ten days before the election, BOE must provide the voter with information as to the location of the election district to which her records have been transferred, or inform the voter that there is no alternative, accessible polling place. *Id.* § 5-601(7). If there is no alternative polling place available, BOE must treat the voter's application as an application for an absentee ballot for the election. *Id.* § 5-601(8).

To apply for an absentee ballot, a voter must submit an application by mail at least seven days or by hand at least one day before the election, stating, in part, that she is "unable to appear at a polling place because of . . . physical disability." *Id.* §§ 8-400(2)(c), 8-400(3)(c)(ii). Such an individual may also apply for the "right to receive an absentee ballot for each election thereafter . . . without further application." *Id.* § 8-400(4).

**2.** *BOE's Designation and Operation of Poll Sites*

BOE does not own any facilities that serve as poll sites. Instead, it designates as poll sites facilities owned either by a private entity or by another governmental agency. Prior to election days, at least 30% of the locations in New York City that BOE designates as poll sites are structurally inaccessible to individuals with disabilities. BOE is currently in the process of surveying each poll site to determine its accessibility.

In an effort to address barriers to access on election days, BOE attempts to use temporary measures to make these locations accessible. Moreover, BOE includes a section in its Poll Worker's Manual to inform poll workers about accessibility issues. BOE also employs teams of Assembly District ("AD") monitors, trained in disability issues and charged with ensuring that poll sites are operated in accordance with all applicable standards, to visit poll sites at least twice on election days.

**3.** *Barriers to Access at New York City Polling Places*

Since 2003, the Center for Independence of the Disabled, New York ("CIDNY"), an entity designated by the State of New York to train and certify poll site surveyors in accessibility issues, has conducted inspections of a random

sample of BOE's poll sites on election days. CIDNY trains its staff and volunteer surveyors to use a checklist consistent with the United States Department of Justice's ADA Checklist for Polling Places. According to survey data from election days in 2008 to 2011, 80% or more of the polling sites surveyed contained at least one physical barrier to access.[2] These barriers include those relating to ramps, entryways, pathways, interior spaces at poll sites, and missing or misplaced signage.

The deposition testimony of surveyors and individuals with disabilities confirms that barriers to access exist on election days that make it difficult for disabled voters to cast their ballots in person. For example, in 2010 Rima McCoy, the Voting Rights Director for CIDNY from July 2008 to December 2011, inspected, among others sites, the poll site located at P.S. 13 in Queens. When she arrived at P.S. 13 there was no sign at the inaccessible main entrance to direct disabled voters to the accessible entrance. After she located the accessible entrance on her own, she found that the door was locked and the bell did not

---

[2] Specifically, in 2008, 54 of the 65 poll sites surveyed, or 83%, contained at least one barrier to access; in 2009, 43 of the 51 polling sites surveyed, or 84%, contained at least one barrier to access; in 2010, 42 of the 53 inspected sites, or 79%, contained at least one barrier to access; and 46 of the 55 polling places inspected in 2011, or 84%, contained at least one barrier to access.

work.  Once inside, McCoy observed that there was no signage from the accessible entrance to direct voters to the voting area or to inform them on which floor the voting area was located.  Further, the placement of the ADA privacy booth in the voting area made the booth inaccessible to wheelchair users.

Denise McQuade, a registered voter who uses a wheelchair for mobility, encountered barriers to access during the September 2010 election at P.S. 102 in Bay Ridge.  The ramp at P.S. 102 was "extremely steep -- like a ski slope." J.A. 728.  McQuade was "very frightened to use [it] because there was no landing at the top of the ramp," and this made it impossible for her to exit the building safely without assistance.  *Id.*  Although she was able to vote with the help of her husband and a police officer, she was afraid to go back to vote in subsequent elections.  Accordingly, she used an absentee ballot in the November 2011 election.

Voters with vision impairments also encountered barriers to access. For example, Paula Wolff, an individual who is legally blind, was unable to privately cast her vote in the November 2011 election.  Some 90% of residents at her polling place, Selis Manor, are blind.  Though Selis Manor is required to have two Ballot Marking Device ("BMD") machines for voters with disabilities, there

was only one BMD machine during the November 2011 election and it was not working. Despite calls by poll workers to BOE regarding the malfunctioning machine, the machine was never repaired. Accordingly, visually disabled voters needed poll workers to read and mark their ballots for them.

As its own information reflects, many of BOE's poll sites are inaccessible on election days. BOE acknowledges that at least two of its poll sites are fully inaccessible. Further, its call incident logs and reports from election days indicate that other sites were missing ramps and other accessibility equipment. Despite being notified of accessibility issues, BOE consistently did not respond to or remedy the problems of which it was made aware. Although BOE plans for AD monitors to visit all poll sites, its own documentation shows that many AD monitors did not visit their planned sites on election days.

BOE does not have an ADA coordinator or someone designated as primarily responsible for ensuring compliance with the ADA, as required by federal regulations. *See* 28 C.F.R. § 35.107(a). Nor does BOE have an accessibility transition plan for the poll sites that it designates. *See id.* § 35.150.

**B.** *Proceedings Below*

On July 26, 2010, plaintiffs filed a complaint against BOE alleging that it discriminated against individuals with disabilities in violation of the ADA and Section 504 by operating polling places with barriers to access. The district court denied plaintiffs' motion for a preliminary injunction. After the parties completed discovery, plaintiffs moved for summary judgment seeking declaratory relief.

In a memorandum and order dated August 8, 2012, the district court granted plaintiffs' motion for summary judgment. *United Spinal Ass'n*, 882 F. Supp. 2d at 627. As an initial matter, the district court rejected BOE's argument that plaintiffs' claims fail because there was no evidence that any voter had been deprived of the right to participate in an election. *Id*. at 623. The district court found that there was "no genuine dispute of material fact as to the existence of pervasive and recurring barriers to accessibility on election days at poll sites designated by the BOE." *Id.* at 624. Moreover, the district court rejected BOE's argument that it accommodates voters with disabilities by (1) offering those assigned to inaccessible poll sites an opportunity to transfer their registration

and (2) addressing barriers as they are made aware of them on election days. *Id.* at 627.

Shortly after granting plaintiffs' motion for summary judgment, the district court ordered the parties to confer and develop potential remedies. Accordingly, plaintiffs met with BOE and proposed a framework for remedial relief. BOE did not respond with feedback or propose a plan of its own. At the hearing on August 27, 2012, BOE offered information about how it was trying to address accessibility issues for the upcoming elections in September and November 2012, including assigning poll site coordinators to each poll site, attempting to survey every poll site in New York City, and providing additional signage at poll sites. BOE also expressed concerns about its ability to hire additional staff and CIDNY's potential oversight in any remedial plan. The district court again ordered parties to discuss a possible remedial plan and scheduled another hearing.

At the hearing on September 10, 2012, BOE described changes that it planned to make for the upcoming primary election that week. Specifically, BOE planned to provide poll site coordinators with special instructions regarding poll site accessibility, a survey instrument to assess whether the site was ADA

- 11 -

compliant throughout the day, and an ADA journal to record their observations. Further, each poll site would receive a five-foot chain to measure areas and ensure that wheelchairs users had adequate space. Teams of AD monitors would also visit poll sites throughout the day. Plaintiffs opined that the proposed changes were not sufficient to remedy the systemic violations. After listening to and reviewing BOE's proposals, the district court determined that it wanted to assess their effectiveness at a sample of poll sites in the upcoming September 2012 Primary Election (the "September 2012 Election"). Accordingly, the district court asked the parties to confer and generate a list of 37 to 40 poll sites that had had an accessibility problem for more than one year. The district court requested that the accessibility data from these poll sites be available by the next conference.

On October 11, 2012, the Department of Justice ("DOJ") appeared, pursuant to 28 U.S.C. § 517,[3] and submitted a proposed order for a remedial plan,

---

[3] 28 U.S.C. § 517 provides that "any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, . . . or to attend to any other interest of the United States."

modeled after a settlement agreement the DOJ had entered into with the City of Philadelphia (the "DOJ proposed order").

At a third hearing on October 15, 2012, BOE discussed the data related to accessibility issues that it collected during the September 2012 Election. Out of the 35 poll sites the parties agreed to monitor, BOE reported that 22 of them had at least one barrier to access. BOE was unable to address many of the problems that were reported throughout the day, and it was unable to determine whether the problems had been rectified from the data that it collected.

A representative of DOJ described the DOJ proposed order. After hearing BOE's concerns, the district court stated its intent to sign an order similar to the DOJ proposed order. It gave BOE the opportunity to confer with DOJ and plaintiffs to suggest changes to the DOJ proposed order, and asked the parties to submit a new proposed remedial order based on BOE's requests. The record does not indicate that another plan was submitted.

In an order dated October 18, 2012 (the "remedial order"), the district court issued a remedial plan. The district court referred oversight of the implementation of the remedial order to Magistrate Judge Pitman.

The remedial order, based on the DOJ proposed order, provides for the following: BOE is to designate one of its existing poll site workers at every poll site as the on-site Americans with Disabilities Act Coordinator, to be trained by CIDNY for the November 6, 2012 General Election and a third-party mutually agreed upon by the parties for elections thereafter. BOE is to contract with CIDNY to develop a poll-site accessibility checklist. The on-site accessibility coordinators shall use the checklist to document any accessibility complaints received on election days and, based on this data, BOE is to submit a report 45 days after an election day.

Further, the remedial order mandates that AD monitors visit each polling site twice on election days to assess the accessibility of the poll site, take steps to assist on-site poll workers to remedy any access barriers at the site, and document the results.

To improve poll site accessibility over the long term, the remedial order also mandates that BOE contract with an independent third-party with expertise in voting accessibility (the "Third Party Expert"). The remedial order provides that the parties are to confer to select the Third Party Expert, and in the event they disagree, the parties are to submit their recommendations to

Magistrate Judge Pitman, who will then make the selection.[4] The Third Party Expert is responsible for surveying the poll sites in New York City and providing a report on poll site accessibility to the parties and Magistrate Judge Pitman. The Third-Party Expert report is to include recommendations as to how specific poll sites may be temporarily modified to make them accessible. If the Third Party Expert concludes that a poll site cannot be reasonably modified, BOE must report to plaintiffs and the Third Party Expert whether the polling site can be relocated or made temporarily accessible.

The remedial order mandates that BOE implement the Third Party Expert's recommendations unless BOE concludes "it cannot reasonably implement a recommendation," "relocation of the polling site to an alternate location is a more appropriate response to the recommendation," or "a polling site cannot be relocated." Order, October 18, 2012, ECF No. 119, at 11. If BOE so concludes, it is to confer with the Third Party Expert and plaintiffs about alternative measures to address accessibility. If BOE, plaintiffs, and the Third Party Expert are unable to agree as to the implementation of a recommendation,

---

[4] On January 28, 2013, after noting that the parties were unable to agree on an expert and considering both parties' recommendations, Magistrate Judge Pitman issued an order designating Evan Terry Associates, P.C. as the Third Party Expert.

- 15 -

BOE may petition Judge Pitman for relief pursuant to Federal Rule of Civil Procedure 60, subject to appeal in the normal course. The Third Party Expert is to train BOE employees to determine whether a poll site is accessible.

The remedial order provides that parties may petition the district court to modify it at any time.[5] Moreover, it provides that the district court shall maintain jurisdiction over the implementation of the remedial order through December 16, 2016.

This appeal followed.

### DISCUSSION

**A.** *Applicable Law*

"We review an order granting summary judgment *de novo* and resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Lederman v. New York City Dep't of Parks & Recreation*, 731 F.3d 199, 202 (2d Cir. 2013) (internal quotation marks and alterations omitted).

---

[5] In fact, at one point BOE did raise a substantive concern. The remedial order was modified on May 13, 2012, after this appeal was filed, to address this concern. The parties' briefs on appeal address the original order entered on October 18, 2012.

We review a district court's decision to award injunctive relief for abuse of discretion. *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 290 (2d Cir. 2003).

**1.** ***Section 504 of the Rehabilitation Act and Title II of the ADA***

Section 504 of the Rehabilitation Act "prohibits programs and activities receiving federal financial assistance from excluding, denying benefits to, or discriminating against 'otherwise qualified'" individuals with a disability. *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012) (quoting 29 U.S.C. § 794(a)). Title II of the ADA likewise provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. As the "standards adopted by the two statutes are nearly identical, we consider the merits of these claims together." *McElwee*, 700 F.3d at 640.

To establish a violation under Section 504 or Title II, a plaintiff must demonstrate that "(1) he is a qualified individual with a disability;[6] (2) the

---

[6] Individuals with a disability are "qualified" if "with or without reasonable modifications to rules, policies, or practices, the removal of architectural . . . barriers, or the provision of auxiliary aids and services," they "meet[ ] the essential eligibility requirements for" participation in public programs or activities. 42 U.S.C. § 12131.

defendant is subject to one of the Acts; and (3) he was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant because of his disability." *Id.*

A public entity discriminates against a qualified individual with a disability when it fails to provide "meaningful access" to its benefits, programs, or services. *Id.* at 641; *accord Henrietta D.*, 331 F.3d at 273. Individuals may be deprived of meaningful access to public programs due to architectural barriers or a public entity's failure to modify existing facilities and practices. Indeed, "elimination of architectural barriers was one of the central aims of the [Rehabilitation] Act." *Alexander v. Choate*, 469 U.S. 287, 297 (1985). The purpose of Title II of the ADA reflects similar concerns.[7] Specifically, "[r]ecognizing that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion, Congress required the States to take

---

[7] *See* 42 U.S.C. § 12101(a)(5) ("[I]ndividuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural . . . barriers, . . . failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities.").

reasonable measures to remove architectural and other barriers to accessibility."

*Tennessee v. Lane*, 541 U.S. 509, 531 (2004). DOJ's implementing regulations

explicitly prohibit a public entity from denying individuals with disabilities

access to its services because its "facilities are inaccessible to or unusable by [such

individuals]." 28 C.F.R. § 35.149. [8] Accordingly, public entities "shall operate

each service, program, or activity, so that the service, program, or activity, when

viewed in its entirety, is readily accessible to and usable by individuals with

disabilities." *Id.* § 35.150(a).

To assure meaningful access, "reasonable accommodations in the

grantee's program . . . may have to be made." *Henrietta D.*, 331 F.3d at 273

(internal quotation marks omitted). Of course, a public entity does not need to

"employ any and all means to make" services accessible. *Lane*, 541 U.S. at 531-32.

Instead, the Acts "require[ ] only reasonable modifications that would not

fundamentally alter the nature of the service provided," or "impose an undue

financial or administrative burden." *Id*. at 532 (internal quotation marks

omitted); *see also Henrietta D.*, 331 F.3d at 281.

---

[8] "In interpreting the statutory terms we look to the views of the Justice Department, which was charged by Congress with issuing regulations implementing both the ADA and Section 504." *Henrietta D.*, 331 F.3d at 273-74.

As the Supreme Court has recognized, Title II's implementing regulations provide a "number of ways" to satisfy the "reasonable modification requirement." *Lane*, 541 U.S. at 532. For example, the regulations explain that "[a] public entity may comply with the [relevant] requirements . . . through such means as redesign or acquisition of equipment, reassignment of services to accessible buildings, assignment of aides to beneficiaries, . . . [and] alteration of existing facilities." 28 C.F.R. § 35.150(b)(1). Importantly, "[a] public entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance" with its obligations. *Id.* Further, "[i]n choosing among available methods for meeting [accessibility] requirements, a public entity shall give priority to those methods that offer services, programs, and activities to qualified individuals with disabilities in the most integrated setting appropriate." *Id*.

### 2. *Injunctive Relief*

"[A]bsent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 70-71 (1992). If local authorities "fail in their affirmative

obligations" under federal law, "the scope of a district court's equitable powers . . . is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971). Indeed, a "district court has 'not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.'" *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1236 (2d Cir. 1987) (quoting *Louisiana v. United States*, 380 U.S. 145, 154 (1965)).

Although the "'remedial powers of [a district court] must be adequate to the task, . . . they are not unlimited.'" *Missouri v. Jenkins*, 495 U.S. 33, 51 (1990) (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 161 (1971)); *see also Yonkers*, 837 F.2d at 1235. A district court must "tailor [a] remedy to fit the nature and extent of the violation." *Yonkers*, 837 F.2d at 1235. Moreover, in accordance with principles of federalism, "one of the most important considerations governing the exercise of equitable power is a proper respect for the integrity and function of local government institutions." *Jenkins*, 495 U.S. at 51.

**B.** *Application*

First, we consider whether BOE is liable under Section 504 and Title II for the systemic failure to provide meaningful access to individuals with disabilities. Second, we consider whether the remedial order was a proper exercise of the district court's discretion to grant equitable relief.

**1.** *Violations of Section 504 and Title II*

BOE does not dispute that the voters plaintiffs represent are qualified individuals with disabilities or that it is a public entity that receives federal funding. It challenges only the district court's holding with respect to the third element of a violation, whether plaintiffs were denied benefits or otherwise discriminated against because of their disabilities. Two inquiries are presented: First, whether BOE denies voters with mobility and vision disabilities meaningful access to its program and services; and second, whether BOE has failed to provide plaintiffs with a reasonable accommodation.

**a.** *Barriers to Meaningful Access*

As an initial matter, BOE contends that "[b]ecause plaintiffs cannot show that any voter has been deprived of the right to participate in an election as a result of barriers to accessibility at a poll site, plaintiffs' claims fail." Appellant's

Br. at 30.  Plaintiffs need not, however, prove that they have been

disenfranchised or otherwise "completely prevented from enjoying a service,

program, or activity" to establish discrimination under Section 504 or Title II.

*Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001).[9]  Rather, plaintiffs must show

that BOE has failed to "provide[ ] [them] with meaningful access to the benefit

that [it] offers."  *Choate*, 469 U.S. at 301; *see also Henrietta D.*, 331 F.3d at 273

(explaining that the relevant inquiry is "whether those with disabilities are as a

practical matter able to access benefits to which they are legally entitled").

Here, the relevant benefit is the opportunity to fully participate in

BOE's voting program.  This includes the option to cast a private ballot on

election days.  *See* N.Y. Elec. Law § 5-601.  Indeed, to assume the benefit is

anything less -- such as merely the opportunity to vote at some time and in some

way -- would render meaningless the mandate that public entities may not

"afford[ ] persons with disabilities services that are not equal to that afforded

others."  *Henrietta D.*, 331 F.3d at 274 (internal quotation and citation omitted); *see*

---

[9]       *See Lane*, 541 U.S. at 514 (successful Title II plaintiff alleged he was able to attend court proceedings only by crawling up two flights of stairs or allowing officers to carry him); *see also Am. Council of the Blind v. Paulson*, 463 F. Supp. 2d 51, 59 (D.D.C. 2006), *aff'd and remanded*, 525 F.3d 1256 (D.C. Cir. 2008) ("[P]laintiffs do not need to prove 'no access' to prevail" on a Section 504 claim.).

*also Choate*, 469 U.S. at 304 ("Section 504 seeks to assure evenhanded treatment and the opportunity for handicapped individuals to participate in and benefit from programs receiving federal assistance.").

By designating inaccessible poll sites and failing to assure their accessibility through temporary equipment, procedures, and policies on election days, BOE denies plaintiffs meaningful access to its voting program. The surveys plaintiffs submitted show that year after year more than 80% of poll sites that are inspected contain at least one barrier that may prevent a person with a disability from accessing his or her assigned polling place.[10] As discussed above,

---

[10]    BOE claims that the surveys plaintiffs submitted are unreliable. We reject this argument. First, BOE conceded at oral argument that there were no disputed facts on which the district court's August 8, 2012 order granting summary judgment was based. Oral Argument at 2:54:27-2:55:17. Second, the record does not indicate that BOE argued this point before the district court. Finally, BOE's arguments are purely conclusory and it has presented no evidence -- such as contrary survey results or specific errors or problems in the surveys submitted by plaintiffs -- to call the validity of plaintiffs' surveys into question. Although BOE contends that the individuals and groups completing the relevant surveys are less experienced than BOE surveyors, nothing in the record supports this claim. In fact, CIDNY is the same entity that trains the surveyors BOE employs. Even assuming that the individuals and groups unaffiliated with BOE are less experienced than BOE surveyors, this fact alone does not support the unreliability of the surveys. Moreover, we note that many courts have relied on surveys conducted by similar surveyors to find poll sites inaccessible. *See Westchester Disabled on the Move, Inc. v. Cnty. of Westchester*, 346 F. Supp. 2d 473, 476-77 (S.D.N.Y. 2004) (relying on poll site accessibility surveys aligned with ADA guidelines to grant preliminary injunction against defendant based on violations of ADA); *New*

these barriers include dangerous ramps at entrances deemed "accessible," inadequate signage directing voters with disabilities to accessible entrances or voting areas, blocked entryways or pathways, and inaccessible interior spaces inside voting areas.

Deposition testimony confirms that barriers exist, as documented in the surveys, and explains the practical effects that the barriers have on individuals with disabilities. For example, as discussed above, McQuade, a voter who uses a wheelchair for mobility, was unable to enter and exit her polling site without assistance from her husband because of a non-compliant ADA ramp, among other things. After this experience, McQuade testified that she was "afraid to go back to try and vote [at her assigned polling place] during subsequent elections," and therefore "decided it would be safer for [her] to use an absentee ballot" even though she would "prefer to vote alongside [her] neighbors and with [her] community." J.A. at 729. Similarly, Wolff, an individual who is legally blind, could not read and mark her ballot independently because her polling site failed to maintain workable BMD machines. These voters'

---

*York v. Cnty. of Delaware*, 82 F. Supp. 2d 12, 14-18 (N.D.N.Y. 2000) (same); *New York ex rel. Spitzer v. Cnty. of Schoharie*, 82 F. Supp. 2d 19, 21-25 (N.D.N.Y. 2000) (same).

experiences, as well as others, demonstrate that barriers at poll sites effectively preclude or deter individuals with disabilities from casting a private ballot on election days.

Although McQuade and Wolff were ultimately able to cast their vote with the fortuitous assistance of others, the purpose of the Rehabilitation Act is "to empower individuals with disabilities to maximize employment, economic self-sufficiency, *independence*, and inclusion and integration into society." 29 U.S.C. § 701(b)(1) (emphasis added). Indeed, as we have noted, "[i]t is not enough to open the door for the handicapped . . . ; a ramp must be built so that the door can be reached." *Dopico v. Goldschmidt*, 687 F.2d 644, 652 (2d Cir. 1982) (internal quotation marks omitted). The right to vote should not be contingent on the happenstance that others are available to help. BOE's services were not "readily accessible" to McQuade and Wolff, and, moreover, McQuade was deterred from appearing at her poll site in subsequent elections. As we have held, "deterrence constitutes an injury under the ADA." *Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 188 (2d Cir. 2013).

BOE does not offer evidence to create a genuine issue of material fact as to whether barriers to access exist. To the contrary, its own call incident logs and reports confirm the existence of these barriers.

### b. *Reasonable Accommodations*

Nevertheless, BOE argues that it is not liable under the Acts because (1) there are no alternative, accessible facilities to serve as poll sites; (2) it already offers individuals with disabilities reasonable accommodation by transferring individuals from inaccessible to accessible polling sites; and (3) plaintiffs have not demonstrated that other reasonable accommodations exist. At their core, these arguments misunderstand BOE's affirmative obligations under the statutes and the nature of the accommodations that plaintiffs seek. Accordingly, they fail.

BOE claims that because "no alternative facility exists to serve as a poll site, there is no reasonable accommodation that can be made that would afford a qualified individual the ability to vote at his or her regularly assigned poll site."[11] Appellant's Br. at 38. Even assuming, however, that "there is no existing facility that is accessible, available, and meets the requirements to serve

---

[11] We recognize that Title II does not require a public entity to "make structural changes in existing facilities where other methods are effective in achieving compliance" with its statutory obligations. 28 C.F.R. § 35.150(b)(1). This provision is particularly relevant to an entity like BOE that does not own or operate any of the facilities that it designates as poll sites, but instead uses facilities operated by others. Indeed, 30% of the facilities BOE designates as poll sites are not compliant with the ADA prior to election days.

- 27 -

as a poll site," *id*. at 34, DOJ's regulations make clear that the inaccessibility of existing facilities is not an excuse, but rather, a circumstance that requires a public entity to take reasonable active steps to ensure compliance with its obligations under Section 504 and Title II. Indeed, to find that BOE's responsibilities end where the very discriminatory effects of architectural and other barriers to access begin would not only frustrate the "clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," *Henrietta D.*, 331 F.3d at 272 (quoting 42 U.S.C. § 12101(b)(1)), but directly contradict the purpose of the Acts. While we agree that BOE is not expected to "create poll sites out of whole cloth," Appellant's Br. at 34, it is required to operate its voting program so that "when viewed in its entirety, [the program] is readily accessible to . . . individuals with disabilities." 28 C.F.R. § 35.150(a).

The steps required by the Acts include the very accommodations that plaintiffs propose -- providing accessibility equipment and ramps, assigning individuals to assist those with disabilities, and relocating services to accessible locations. *Id.* at § 35.150(b). Moreover, the barriers that plaintiffs' evidence documents -- for example, missing or improperly placed accessibility equipment

and locked doors at otherwise accessible entrances -- reflect systemic problems with BOE's preparation and operation of poll sites that are distinct from BOE's obligation to designate readily-accessible facilities prior to an election day. Accordingly, the fact that BOE cannot find alternative, accessible facilities to serve as poll sites is the start, not the end, of our inquiry as to whether BOE is liable under the Acts.[12]

BOE next argues that it already provides reasonable accommodations for voters with disabilities by (1) reassigning these voters from inaccessible to accessible poll sites and (2) remedying barriers to access as they are made aware of them on election days. While we recognize that reassigning voters may constitute a reasonable accommodation under some circumstances, *see* 28 C.F.R. § 35.150(b), there is nothing in the record to show that this accommodation provides meaningful access in the circumstances here.[13]

---

[12] For similar reasons, we reject BOE's argument that "plaintiffs have the burden of production to demonstrate the existence of alternative, available facilities to serve as replacement poll sites." Appellant's Br. at 35. Plaintiffs, like BOE, are certainly not required to identify facilities that are accessible prior to election days. We note that, in any event, plaintiffs did suggest alternative facilities to BOE to serve as poll sites.

[13] In particular, BOE offers no evidence that it has transferred voters from inaccessible to accessible sites or otherwise notified individuals of the possibility of such a transfer. This lack of evidence is problematic. First, it is unclear how BOE, let

Moreover, plaintiffs' evidence and BOE's own records confirm that BOE's *ad hoc* policy of remedying barriers to access as they occur is inadequate, especially as BOE does not respond to many accessibility issues even after they are brought to its attention.

Finally, BOE contends that plaintiffs' claims fail because they have not demonstrated that reasonable accommodations exist. Plaintiffs have, however, made a *prima facie* showing that the relief they obtained -- the district court's remedial order, which was fashioned after BOE had multiple opportunities to be heard -- "represents an attempt at reasonable accommodation" that "at its core orders [BOE] to perform its statutory

---

alone an individual voter, would know ten days prior to an election that a particular poll site is inaccessible. Indeed, BOE concedes that several sites do not meet accessibility standards, but it has only officially identified two inaccessible polling places. Further, most of the barriers that plaintiffs report are impossible for voters to perceive until they appear at polling sites on an election day. Second, plaintiffs' undisputed evidence demonstrates that 80% or more of the poll sites surveyed on election days have one or more significant barriers to access. As a practical matter, then, it would seem nearly impossible that this accommodation would provide meaningful access for many individuals with disabilities. Accordingly, while the policy of reassigning voters to accessible polling sites could theoretically constitute a reasonable accommodation, there is nothing in the record to support that it provides meaningful access to individuals with disabilities.

[obligations], and imposes some procedural mechanisms designed to effectuate this goal," *Henrietta D.*, 331 F.3d at 280, as discussed below.[14]

It is BOE's responsibility, then, to show that the accommodations plaintiffs propose would be unreasonable to implement. *See Henrietta D.*, 331 F.3d at 280 ("[I]t is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits," and once this is done "the risk of nonpersuasion falls on the defendant.") (internal quotation marks omitted). In particular, BOE must demonstrate that a proposed accommodation would "fundamentally alter the nature of [its voting program]" or "impose an undue financial or administrative burden" on its operation. *Lane*, 541 U.S. at 532.[15] For the reasons discussed below, BOE has not made this showing.

---

[14] We need not decide whether plaintiffs or defendants bear the initial burden regarding reasonable accommodation because, even if we accept defendants' argument that plaintiffs bear the initial burden, there is no question that plaintiffs have met that burden here.

[15] *See also Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 603-04 (1999) (Ginsburg, *J.*, plurality opinion) (discussing the reasonable modification regulation as the State's "fundamental-alteration defense"); *id.* at 607 (Stevens, *J.*, concurring) (explaining that a "state may assert, as an affirmative defense, that the requested modification would cause a fundamental alteration of a State's services and programs").

In sum, we agree with the district court that the undisputed facts demonstrate that BOE fails to provide individuals with meaningful access to its voting program and that the proposed accommodations, as set forth in the remedial order discussed below, are reasonable and do not fundamentally alter BOE's voting program or impose an undue burden on its operation. Accordingly, we hold that the district court did not err in granting plaintiffs' motion for summary judgment.

### 2. *Injunctive Relief*

We turn to the issue of relief, and conclude that the district court did not abuse its discretion in awarding plaintiffs injunctive relief.

As Congress did not express any intent to limit the remedies available under Title II or Section 504, equitable relief was proper for the district court to consider. *See Franklin*, 503 U.S. at 70-71; *cf. Henrietta D.*, 331 F.3d at 280-84. Nevertheless, the district court's "remedial powers . . . are not unlimited." *Jenkins*, 495 U.S. at 51 (internal quotation marks omitted). Accordingly, while equitable relief under the Acts is possible, this threshold determination is only part of the inquiry. We must consider whether the remedial order is "tailor[ed] to fit the nature and extent of the violation," *Yonkers*, 837 F.2d at 1235, and

whether the "exercise of equitable power [reflects] a proper respect for the integrity and function of local government institutions," *Jenkins*, 495 U.S. at 51. We address these considerations in turn.

### a. *Tailored to Fit the Nature and Extent of BOE's Violations*

First, we find that the remedial order is "tailor[ed] . . . to fit the nature and extent of [BOE's] violation[s]." *Yonkers*, 887 F.2d at 1235. Plaintiffs' evidence shows that barriers to access are pervasive and stem both from BOE's inadequate operation of poll sites on election days and its failure to properly plan to make facilities temporarily accessible. BOE's evidence and arguments, in turn, reveal that although it has some procedures and policies in place to accommodate individuals with disabilities, these accommodations consistently fall short. Moreover, the record suggests that in practice these mechanisms may not receive high priority or, in any event, have proven difficult for BOE to implement.[16]

---

[16] By way of example, while BOE maintains that it has attempted to survey poll sites over the past several years, it presented no evidence of these surveys. Indeed, the fact that it has only labeled two of 1,300 sites inaccessible, but also concedes that prior to election days 30% of facilities it uses for poll sites are inaccessible, suggests that BOE has much work to do.

The remedial order addresses these issues. Specifically, to remedy violations that likely arise from BOE's operation of poll sites, the first part of the order outlines policies and procedures for on-site accessibility coordinators and AD monitors (the "Operation Provisions"). The second part attempts to remedy barriers to access or ineffective accommodations that likely stem from BOE's failure to identify accessible facilities or determine how sites may be temporarily modified (the "Facilities Provisions"). The Facilities Provisions create a process by which the Third Party Expert surveys facilities and makes suggestions to BOE as to how to improve accessibility. BOE then adopts the suggestions or confers with the Third Party Expert to find alternative measures.

Further, the remedial order provides accountability mechanisms to ensure that BOE is focusing on its statutory obligations to provide meaningful access to individuals with disabilities. In particular, it requires (1) on-site accessibility coordinators and AD monitors to document barriers on election days and indicate how, if at all, these barriers were addressed; (2) BOE to compile and write a report from the on-site data; and (3) BOE to work with the Third Party Expert to find ways to make facilities accessible. In other words, the processes in the remedial order force BOE to move beyond its claim that it is

doing all that it can to provide reasonable accommodations, and to begin to proactively identify barriers, document its efforts, reflect on its challenges and successes to provide meaningful access, and use this information to improve the accessibility of its voting program over time.

BOE argues that "certain sections of the order exceed the requirements of the applicable statutes." Appellant's Letter Br. at 5. We disagree. Title II and Section 504 mandate that BOE provide individuals with disabilities meaningful access to its voting program by making reasonable modifications. This meaningful access standard is "responsive to two powerful but countervailing considerations -- the need to give effect to the statutory objectives and the desire to keep [the Acts] within manageable bounds." *Choate*, 469 U.S. at 299. We find that the remedial order reflects this standard. Its provisions balance BOE's obligations to modify facilities, policies, and procedures with its practical resource constraints. In particular, the Operations Provisions build on personnel, policies, and procedures that BOE already has in place. The Facilities Provisions provide that BOE need not adopt a recommendation if, among other things, it concludes that it "cannot reasonably implement a recommendation." Order, October 18, 2012, ECF No. 119, at 11. This determination then triggers an

iterative process between BOE and the Third Party Expert to confer about alternative, more feasible measures to provide accommodation.

Finally, BOE argues that the remedial order contains "excesses" that "generally fall into the categories of reporting and the expense associated with compliance with the order." Appellant's Letter Br. at 5. As an initial matter, we emphasize that despite its opportunity to address the concerns it had with the remedial order before the district court, BOE did not argue below that any of its components were unreasonable. Nor did BOE make this claim in its opening or reply brief on appeal. Only after we ordered BOE to submit a "letter brief addressing in further detail its objections to the [d]istrict [c]ourt's order on remedies" did BOE argue, *for the first time* on appeal, that complying with certain provisions of the order would "place[ ] an undue burden" on its voting program. *Id.* at 7.

In particular, BOE claims that (1) a worker at each poll site will not be able to serve as an on-site accessibility coordinator because of other responsibilities; (2) BOE will have difficulty collecting data from its poll sites; (3) and, depending on how many poll sites the Third Party Expert concludes cannot be modified temporarily, BOE may have difficulty suggesting alternative sites or

modifications. Without more than conclusory claims that complying with the remedial order may be challenging, we are not persuaded that the accommodations will fundamentally alter BOE's voting program or impose an undue burden on its operation.

To the extent that complying with the remedial order becomes unreasonable, the remedial order provides mechanisms through which BOE may petition the district court, and if necessary this Court, for relief. Moreover, we note that at the time of this appeal, BOE has already proceeded to implement the remedial order and has not pointed to any actual undue burden from its efforts to comply with it thus far. In the one instance where BOE raised a concern, the remedial order was modified to address the concern.

Accordingly, we conclude that the remedial order is tailored to respond to and remedy BOE's violations of Section 504 and Title II.

### b. *Respect for the Integrity and Function of BOE*

Second, we find that both the process through which the district court provided injunctive relief and the remedial order itself reflect "a proper respect for the integrity and function of local government institutions." *Jenkins*, 495 U.S. at 51.

We emphasize that "[a]s public servants, the officials of the State [or City] must be presumed to have a high degree of competence in deciding how best to discharge their governmental responsibilities." *Frew v. Hawkins*, 540 U.S. 431, 442 (2004). Indeed, State and local officials are elected, in part, "to bring new insights and solutions to problems of allocating revenues and resources." *Id.* Hence, "[r]estraint and initial deference to state institutional authorities in curing [unlawful] conditions are . . . advisable as a matter of realism; federal courts lack the facilities or expertise [to administer] plans designed to assure that a state will provide . . . acceptable . . . services." *Dean v. Coughlin*, 804 F.2d 207, 213-214 (2d Cir. 1986). Accordingly, we review both the process that led the district court to issue the remedial order and its substantive provisions with these important federalism and institutional capacity principles in mind.

BOE argues that the district court "erred in adopting its own detailed remedial plan instead of directing [BOE] to formulate a plan for curing any perceived constitutional deficiencies in the existing system." Appellant's Br. at 41. The district court, however, gave BOE multiple opportunities to submit a written plan, to offer suggestions, to test its proposed accommodations, and to

modify DOJ's proposal based on its concerns. [17]  The district court issued a plan

only after BOE failed to provide written suggestions or demonstrate the efficacy

of its accommodations for the September 2012 Election.  Accordingly, the district

court did not ignore the notion that it is appropriate, if not preferable, to give a

local entity an opportunity to propose ways to remedy statutory deficiencies. [18]

Rather, in light of its extensive efforts to consider BOE's proposals and input, we

conclude that the district court demonstrated proper "[r]estraint and initial

deference" to BOE in "curing [the relevant] conditions."  *Coughlin*, 804 F.2d at

213.

          The substance of the remedial order also reflects proper respect for

BOE.  First, the remedial order addresses the concerns BOE voiced at hearings

---

[17]      *See* Order, Aug. 15, 2012, ECF No. 107, at 1 (parties required to "meet, at least once, and develop potential remedies as a basis for the . . . hearing before the Court"); Tr. of Hearing on Aug. 27, 2012, 14:10-11, 45:22-25, 46:1-4, Oct. 19, 2012, ECF No. 120 (noting that BOE "has not had an opportunity to reduce [its suggestions] to writing" and giving parties additional time "to get together and talk and work out things that are helpful, with open minds . . . so that when you appear before me [at the next hearing], I will be in a better position to know whether or not some more formal relationship imposed by the Court is the only alternative."); Tr. of Hearing on Oct. 15, 2012, 2:20-24, 3:1-19 (noting submissions from parties, including a status report from BOE, but no proposed plan from BOE).

[18]      *See, e.g., Bell v. Wolfish*, 441 U.S. 520, 547-48 (1979); *Dean*, 804 F.2d at 213-14.

before the district court: its inability to hire additional poll workers[19] and that

CIDNY would have a controlling role in any plan.[20]

Second, the remedial order reflects the awareness that courts often

do not have the expertise or the institutional capacity "needed for formulation

and day-to-day administration of detailed plans designed to assure that [a public

entity] will provide . . . acceptable . . . services." *Id.* at 213-14. As an initial

matter, we note that the remedial order is substantially based on the DOJ's

proposed order. The DOJ's proposed order, in turn, is modeled after a settlement

agreement that the DOJ entered into with Philadelphia, a city with similar

accessibility challenges. The district court did not, therefore, depend on its own

ideas of how to improve BOE's program, but rather relied on a tested remedial

plan proposed by the DOJ, the federal agency tasked with overseeing the

implementation of the Acts, whose views about the Acts "warrant respect."

*Olmstead*, 527 U.S. at 598.

Further, as noted above, the remedial order is largely procedural in

nature. In other words, it does not mandate particular changes or modifications,

---

[19] Order, Oct. 18, 2012, ECF No. 119, at 3 ("This paragraph does not require the BOE to hire any additional staff at its poll sites.").

[20] *Id.* at 2-3 (providing after the November 6, 2012 General Election "BOE may contract with a third-party, mutually agreed upon by the parties, to develop training").

- 40 -

but rather creates a framework for BOE to cooperate with experts and plaintiffs to confront accessibility challenges and develop feasible accommodations over time.  The district court's role, exercised through Magistrate Judge Pitman, is to oversee this process and mediate conflict among the parties and experts, rather than effectively run or take over the BOE.  Importantly, the remedial order does not contemplate the district court's oversight indefinitely; instead it sets December 31, 2016 as a clear end date for the district court's jurisdiction.

Third, the remedial order implicitly recognizes BOE's central role in managing its voting program and the need for BOE to build capacity to identify and address barriers to access on its own.  Indeed, many of its provisions provide opportunities for BOE to decide what is in its best interest or to propose alternatives to the Third Party Expert's suggestions to reach the same accessibility goals.  The remedial order also stresses that the Third Party Expert "shall train employees of the BOE on using the survey instrument and determining whether a polling site location is or can be made accessible."  Order, October 18, 2012, ECF No. 119, at 12-13.

For the foregoing reasons, we determine that the district court did not abuse its discretion in granting plaintiffs injunctive relief and fashioning the remedial plan here.

We emphasize that while the remedial order, on its face, respects BOE's responsibilities and recognizes the limited capacity of the district court to suggest ways in which BOE should "discharge [those] responsibilities," *Frew*, 540 U.S. at 442, the district court must, in practice, exercise prudent oversight. We recognize -- and the process that the remedial order creates reflects -- that providing meaningful access to individuals with disabilities in a large, crowded city with inaccessible facilities is not an easy task that lends itself to simple or singular solutions. Hence, the district court's supervision should recognize that there are many ways BOE may meet its statutory obligations and focus on building and strengthening BOE's capacity to identify and address the accessibility issues its program confronts. Indeed, the very success of the remedial order depends, in part, on BOE's ability by December 31, 2016 to develop and implement its own plan to work towards providing meaningful access to all of the voters that its serves. We are confident the district court will exercise its oversight with this goal in mind.

## *CONCLUSION*

We conclude that the district court correctly held that BOE has failed to grant voters with disabilities meaningful access to its voting program.  We also find that the remedial order is a proper exercise of the district court's authority to grant equitable relief.  Accordingly, the order is AFFIRMED.