**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2015

(Argued:  February 18, 2016      Decided: July 29, 2016)

Docket No. 15-3168-cv

_____

NATHANIEL WRIGHT,

*Plaintiff-Appellant,*

- v. -

NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION,
ANTHONY ANNUCCI, Acting Commissioner of Department of Corrections and
Community Supervision, CHARLES KELLY, JR., Superintendent; Marcy
Correctional Facility,

*Defendants-Appellees.*[*]

_____

Before:      WINTER, HALL, and DRONEY, *Circuit Judges.*

Nathaniel Wright, a mobility-impaired inmate in the custody of the New York State Department of Corrections and Community Supervision, appeals a decision from the United States District Court for the Northern District of New York (D'Agostino, *J.*) granting summary judgment against him on his claims under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA").  The district court denied declaratory and injunctive relief that would have allowed Wright to use his motorized wheelchair while he is incarcerated.

---

[*] The Clerk of Court is respectfully directed to amend the caption as set forth above.

Because we determine that Department of Corrections' blanket ban on motorized wheelchairs violates the ADA and the RA and that there is a dispute of material fact as to whether defendants provided Wright meaningful access to DOCCS services or would be unduly burdened by allowing Wright the use of his motorized wheelchair, we vacate the judgment and remand for further proceedings.

JOSHUA T. COTTER, Legal Services of Central New York, Inc., Syracuse, NY, *for Plaintiff-Appellant*.

KATE H. NEPVEU, Assistant Solicitor General (Barbara D. Underwood, Solicitor General & Andrea Oser, Deputy Solicitor General, *on the brief*), for Eric T. Schneiderman, Attorney General of the State of New York, Albany, NY, *for Defendants-Appellees*.

WINTER and HALL, *Circuit Judges*:

Appellant Nathaniel Wright, a mobility-impaired inmate who suffers from cerebral palsy and scoliosis, brought suit against the New York State Department of Corrections and Community Supervision and certain of its officers (collectively, "DOCCS") under Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("RA") seeking declaratory and injunctive relief allowing him to use his motorized wheelchair within DOCCS facilities. Wright makes three arguments: (1) DOCCS's mobility assistance program is not a reasonable accommodation for his disability, (2)

allowing him to use his motorized wheelchair would not unduly burden DOCCS, and (3) DOCCS's blanket ban on motorized wheelchairs violates the ADA and RA. After discovery, the district court granted summary judgment in favor of DOCCS and determined that the mobility assistance program gives Wright meaningful access to prison programs, benefits, and services.

We hold that the district court erred by granting summary judgment in favor of DOCCS because there is a genuine dispute of material fact as to whether the mobility assistance program provides Wright meaningful access to DOCCS services and as to whether allowing Wright the use of his motorized wheelchair would unduly burden DOCCS. In arriving at this conclusion, we further hold that DOCCS's blanket ban on motorized wheelchairs—without an individualized inquiry into the risks of allowing a mobility-impaired inmate to use his or her motorized wheelchair—violates the ADA and the RA. We therefore vacate the grant of summary judgment and remand for further proceedings consistent with this opinion.

## BACKGROUND

Wright has lived with cerebral palsy and scoliosis all his life. As a result of cerebral palsy, Wright's legs are severely deformed. He can walk only for very

short distances and only with the aid of a cane. Since April 2012, Wright has been incarcerated in various New York state jails and prisons. For twenty years prior to incarceration, however, he enjoyed a self-sufficient life through the use of a doctor-prescribed, and Medicaid-provided, motorized wheelchair. His expressed need to continue using his motorized wheelchair while in prison is the impetus for this lawsuit.

Wright was initially incarcerated in Monroe County Jail, where he was allowed to use his motorized wheelchair in the general population without incident. In October 2012, he was transferred to DOCCS custody at the Elmira Correctional Facility ("Elmira"). After a prison nurse practitioner examined him, Wright was deemed to have a "permanent limitation," given a medical restriction permit, and allowed to use his motorized wheelchair while in the infirmary ward. Joint App'x at 49. After a brief two-week stay at Elmira, Wright was transferred to Marcy Correctional Facility ("Marcy"). About a year later Wright was transferred to Franklin Correctional Facility ("Franklin") where he remains incarcerated. Wright's claims are premised on his time at both Marcy and Franklin.

Upon arrival at Marcy, DOCCS personnel seized Wright's motorized wheelchair and provided him with a manual wheelchair and a quad cane. Wright was also provided knee pads and was allowed to use his customized chair cushion with his DOCCS-issued manual wheelchair. DOCCS informed Wright that he would be assigned an inmate mobility aide to move him around the facility. Shortly after his motorized wheelchair was confiscated, Wright filed a prison grievance seeking "reasonable accommodations needed to get around the facility independently (i.e. [his] power wheelchair)." Id. at 23. Marcy Superintendent Kelly denied the grievance, finding that Wright's needs were already met. Superintendent Kelly also declared that, because "the possession/use of a motorized wheelchair in a correctional setting includes numerous safety & security issues, Departmental policy is to preclude the use of such items by offenders." Id. This decision was later upheld on appeal by DOCCS's Central Office Review Committee ("CORC"), which noted that "the motorized wheelchair was appropriately denied for legitimate security concerns regarding the strength of the battery, massive amount of wiring, etc." Id. at 25. CORC stated that Wright's needs were already being reasonably accommodated because he had been given a manual wheelchair and was "assigned another

inmate who is programmed as a mobility aide to assist him with daily living activities and movement within the facility." Id.

DOCCS has a blanket policy that precludes the use of motorized wheelchairs by inmates. Mobility-impaired inmates who cannot propel themselves in a manual wheelchair must rely upon inmate mobility aides to move throughout the facility and to attend programs and services. At Marcy, Wright was assigned a specific mobility aide who knew Wright's general schedule and for whom other aides would substitute as necessary. At Franklin, however, Wright was not assigned specific mobility aides; instead, he received assistance from a pool of trained inmates. Franklin provides four trained mobility aides for each mobility-impaired inmate. In both facilities Wright could utilize mobility aides only if he put in a request for assistance with "Housing Unit Officers well in advance." Id. at 308.

Wright alleges that the mobility assistance program does not provide him meaningful access to prison programs and services. According to Wright, his disability is such that he is only able to move himself in a manual wheelchair for short periods of time and for short distances because using a manual wheelchair

causes him physical pain. As a result, he is almost entirely dependent on the mobility assistance program, which he attests is unreliable and ineffective.

For example, Wright, at times, has had to ask as many as six mobility aides for help before finding a willing aide. On multiple occasions he has been unable to go to the law library and missed morning sick calls, doctor appointments, and meals. Late at night, he often does not "bother" the mobility aides and instead attempts to propel himself to the bathroom. Joint App'x at 155. Even though his cell is about thirty feet from the bathroom, making this trip on his own causes him a great deal of pain, and, on more than one occasion, he has defecated or urinated on himself. Wright has been unable to perform a number of jobs that he would otherwise be able to perform if he had access to his motorized wheelchair, including being a part of the lawn and grounds crew. Finally, Wright avoids recreational time in the yard because he fears he would be unable to escape quickly in the event of a prison fight, and when he is forced to spend recreational time in the yard, he is physically and socially isolated because no inmates are willing to push him around.

While Wright has testified that the mobility assistance program has caused him, among other things, indignity and embarrassment, he has never filed a

15-3168-cv

*Wright v. New York State Dep't of Corr. & Cmty. Supervision*

grievance identifying a specific aide who refused to push him. He did file one grievance at Franklin alleging that he missed a doctor's appointment because no mobility aide was willing to push him. An investigation later found, however, that Wright missed this appointment as a result of a facility inmate count, not because a mobility aide was unavailable. According to Wright, he has chosen not to identify shirking mobility aides because a person in his "condition [] can't afford being labeled a snitch." Joint App'x at 189.

On May 15, 2013, Wright commenced this action, alleging that DOCCS discriminated against him and failed to provide him with a reasonable accommodation in violation of the ADA and the RA. On July 1, 2013, he moved for a preliminary injunction seeking the return of his motorized wheelchair pending a determination of his suit on the merits. The District Court denied the motion. We affirmed this decision by summary order, determining that "the District Court did not abuse its discretion in denying Wright's preliminary injunction." Wright v. Dep't of Corr. & Cmty. Supervision, 568 Fed. App'x 53, 55 (2d Cir. 2014). We declined, however, to give a "view on the merits" of Wright's ADA and RA claims and "encourage[d] the District Court to consider whether

DOCCS is an outlier among state prison systems in denying prisoners the use of motorized wheelchairs." Id.

On July 3, 2014, Wright filed a second amended complaint "seek[ing] declaratory and injunctive relief to compel [DOCCS] to allow [Wright the] use of his personal motorized wheelchair within DOCCS facilities." Joint App'x at 63. Wright set forth evidence that thirty state prison systems and the Federal Bureau of Prisons allow mobility-impaired inmates to use motorized wheelchairs, at the very least, on a case-by-case basis. Only eleven states, including New York, have a blanket ban on the use of motorized wheelchairs.

DOCCS employees outlined a number of security concerns with motorized wheelchairs beyond their potential use as a weapon, including the following: (1) motorized wheelchairs are heavy, weighing between 228 and 278 pounds, and can injure individuals who are inadvertently hit by them; (2) they are complex machines that cannot easily be inspected and can be used to hide contraband; and (3) motorized wheelchairs are powered by potentially dangerous acid batteries.

In response, Wright produced evidence to counter these security concerns. He provided a DOCCS directive stating that prisoners are allowed to have

electric typewriters, lamps, audio equipment, and hair dryers—devices which have wires or batteries and in which contraband could be hidden. Wright provided an affidavit from Eldon Vail, a former Secretary for the Washington State Department of Corrections, who stated that the Washington prison system allows motorized wheelchairs on a case-by-case basis and that he was unaware of a single incident or problem involving an inmate's use of a motorized wheelchair. Vail also noted that mobility-impaired inmates who use motorized chairs are easier to manage, and he observed that DOCCS had not actually assessed the individualized risks associated with allowing Wright to use his motorized wheelchair. He also stated that had DOCCS staff actually inspected Wright's motorized wheelchair, they would have found that the battery and wiring of the wheelchair are "secured in such a way that tools are required to access them." Joint App'x at 103. Vail also asserted that because Wright has had no behavioral problems while incarcerated, Wright's use of a motorized wheelchair was unlikely to be a security concern.

After discovery, the parties cross-moved for summary judgment. On September 30, 2015, the district court denied Wright's motion and granted DOCCS's cross-motion. The court first found that Wright had not established

that DOCCS's "blanket policy prohibiting the use of motorized wheelchairs within their prisons violates his [] rights under the ADA/RA . . . ." Wright v. Dep't of Corr. & Cmty. Supervision, No. 9:13-cv-564, 2015 WL 5751064, at *15 (N.D.N.Y. Sept. 30, 2015). The district court then held that the mobility assistance program was a reasonable accommodation for Wright's disability, determining that it "gave him meaningful access to the [prison] facilities' programs, benefits, and services." Id. The district court, in the alternative, denied Wright's request for injunctive relief because he failed to issue a formal administrative complaint or engage in an interactive mediation process with DOCCS. Id. at 16. Wright appealed.

**DISCUSSION**

**a. Standard of Review**

We review *de novo* the district court's grant of summary judgment in favor of DOCCS. See Bermudez v. City of N. Y., 790 F.3d 368, 373 (2d Cir. 2015). We "resolve all ambiguities and draw all permissible factual inferences in favor" of the non-moving party, Patterson v. Cty. of Oneida, N.Y., 375 F.3d 206, 219 (2d Cir. 2004), and will affirm summary judgment only if the moving party shows

that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law[,]" Fed. R. Civ. P. 56(a).

**b. ADA and RA Claims**

Title II of the ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the RA requires that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). Because the standards under both statutes are generally the same and the subtle distinctions between the statutes are not implicated in this case, "we treat claims under the two statutes identically." Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003).

In order to establish a prima facie violation under these acts, Wright must show that 1) he is a qualified individual with a disability; 2) DOCCS is an entity subject to the acts; and 3) he was denied the opportunity to participate in or

benefit from DOCCS's services, programs, or activities or DOCCS otherwise discriminated against him by reason of his disability. Id. Wright undoubtedly satisfies the first two elements: DOCCS does not dispute that Wright is a qualified individual because he suffers from cerebral palsy and scoliosis or that DOCCS is an entity that is subject to the statutes. Fulton v. Goord, 591 F.3d 37, 43 (2d Cir. 2009) (recognizing that DOCCS is subject to the ADA and RA). Both the ADA and the RA undoubtedly apply to state prisons and their prisoners. See Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 209 (1998) (holding the ADA "unmistakably includes State prisons and prisoners within its coverage"). The parties, however, dispute the third element: whether DOCCS denies Wright the opportunity to participate in or benefit from prison services, programs, or activities. Wright asserts that DOCCS discriminated against him under a "failure to make a reasonable accommodation" theory. Fulton, 591 F.3d at 43 (internal quotation omitted).

In examining this claim, we ask whether a plaintiff with disabilities "as a practical matter" was denied "meaningful access" to services, programs or activities to which he or she was "legally entitled." Henrietta D., 331 F.3d at 273. DOCCS implements "programs, services, or activities" because, among other

things, they "provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational programs . . . .'" <u>Yeskey</u>, 524 U.S. at 210. In order "to assure meaningful access, reasonable accommodations in the [] program[s] or benefit[s] may have to be made." <u>Alexander v. Choate</u>, 469 U.S. 287, 301 (1985). "The hallmark of a reasonable accommodation is effectiveness." <u>Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.</u>, 804 F.3d 178, 189 (2d Cir. 2015). Specifically, a reasonable "accommodation need not be 'perfect' or the one 'most strongly preferred' by the []plaintiff, but it still must be 'effective[.]'" <u>Id.</u> (quoting <u>Noll v. Int'l Bus. Machs. Corp.</u>, 787 F.3d 89, 95 (2d Cir. 2015)). Determining the "reasonableness of an [] accommodation is a 'fact-specific' question that often must be resolved by a factfinder." <u>Noll</u>, 787 F.3d at 94 (internal quotation omitted). A defendant is "entitled to summary judgment only if the undisputed record reveals that the plaintiff was accorded a 'plainly reasonable' accommodation." <u>Dean</u>, 804 F.3d at 189 (quoting <u>Noll</u>, 787 F.3d at 94).

**1. Reasonableness of DOCCS's accommodation**

A reasonable accommodation must provide effective access to prison activities and programs. <u>See, e.g.</u>, <u>Randolph v. Rodgers</u>, 170 F.3d 850, 858 (8th

Cir. 1999) (holding a deaf inmate's "limited participation" in activities does not support a finding that although he did not have an interpreter, he "enjoyed meaningful access"). That is, the accommodation must overcome structural impediments and non-trivial temporal delays that limit access to programs, services, and activities. See Celeste v. E. Meadow Union Free Sch. Dist., 373 Fed. App'x. 85, 88 (2d Cir. 2010) (finding sufficient evidence for a jury to conclude that a mobility-impaired student was denied meaningful access because he was "forced [] to take a ten minute detour" in order to participate as the manager of his school's football team). An accommodation is not plainly reasonable if it is so inadequate that it deters the plaintiff from attempting to access the services otherwise available to him. See Disabled in Action v. Bd of Elections in City of N. Y., 752 F.3d 189, 200 (2d Cir. 2014) (recognizing that "deterrence constitutes an injury under the ADA" (quoting Kreisler v. Second Ave. Diner Corp., 731 F.3d 184, 188 (2d Cir. 2013))). In short, providing meaningful access requires just that—granting inmates *meaningful* participation in prison activities and programs.

In order to accommodate Wright's disability, DOCCS provided Wright a quad cane, a manual wheelchair, use of his customized cushion, knee pads,

wheelchair accessible living space, and access to mobility aides from the mobility assistance program. The district court determined that this accommodation was reasonable and that there were no material disputes of fact over whether DOCCS "provided [Wright] with reasonable accommodations that gave him meaningful access to [prison] programs, benefits, and services." Wright, 2015 WL 5751064 at *15. We disagree. On this record, we cannot determine that DOCCS's accommodations are plainly reasonable and effectively provide Wright meaningful access to prison programs, benefits, and services because there is evidence that indicates the mobility assistance program fails to allow Wright to move freely throughout the DOCCS facility and discourages his participation in prison activities.

Wright testified that while at the Marcy and Franklin facilities he has been unable to access programs, services, and activities that other inmates routinely access. He stated that he has been, at times, unable to visit the law library and has missed multiple morning sick calls, doctor appointments, and meals. He states that he defecated or urinated on himself on more than one occasion, because he was unable to propel himself to a bathroom. A number of jobs that he hoped to perform—such as being a member of the lawn and grounds crew—

are unavailable to him. Finally, he attests that he avoids recreational time in the prison yard because he fears he would be unable to escape quickly in the event of a prison fight and he feels socially isolated without the ability to move about the yard. Undoubtedly, these shortcomings are examples of Wright being denied meaningful access to prison services, programs, and activities. See, e.g., Randolph, 170 F.3d at 858.

This lack of meaningful access, moreover, appears to be a direct result of the ineffectiveness—in design and implementation—of the mobility assistance program. Indeed, at both Franklin and Marcy the mobility assistance program required Wright to request mobility aides from "Housing Unit Officers *well in advance*." Joint App'x at 308 (emphasis added). This aspect of the program prevents Wright from effectively moving about the facility and discourages him from participating in prison activities. See Disabled in Action, 752 F.3d at 200. A mobility-impaired inmate that must book a mobility aide "well in advance" will be unlikely, for example, to obtain assistance when a sudden need to use the restroom arises and will probably avoid the prison yard, lest he or she be unable to escape a prison fight quickly.

Wright's deposition testimony, when credited, leads to the further conclusion that the mobility assistance program, in practice, is ineffective because it requires Wright to seek out and rely upon the cooperation of other inmates. See Am. Council of the Blind v. Paulson, 525 F.3d 1256, 1269 (D.C. Cir. 2008) (noting that the ADA and RA emphasize that for disabled individuals the "enjoyment of a public benefit is not contingent upon the cooperation of third persons"). Wright has, at times, had to ask as many as six mobility aides for help before finding a willing inmate. While the district court faults Wright for failing to request mobility aides in advance and for informally requesting help from mobility aides whenever he needed one, as noted above, by requiring inmates to make a formal request in advance for an aide, DOCCS has created a system which fails to provide inmates with mobility assistants in situations where their need to move cannot be contemplated in advance. In other words, rather than constituting a reason to fault Wright's efforts to obtain help, Wright's informal requests for assistance are a reasonable response to the mobility assistance program's inadequate procedures to meet Wright's spontaneous needs. Wright's sporadic use of the formal requests thus does not diminish his argument that the mobility assistance program is not plainly reasonable.

The district court granted summary judgment in favor of DOCCS, in part, because it did not credit Wright's deposition testimony and concluded that it was "entirely implausible that incidents such as [those alleged by Wright] would not be documented by the prison staff in some way." Wright, 2015 WL 5751064 at *11. But, as we repeatedly iterate, "[i]n determining whether summary judgment [is] appropriate, we must resolve all ambiguities and draw all inferences" in Wright's favor. Parker v. Columbia Pictures Indus., 204 F.3d 326, 332 (2d Cir. 2000); see also Simpson v. City of N. Y., 793 F.3d 259, 265 (2d Cir. 2015) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (internal quotation omitted)). Contrary to the district court's views, it is entirely plausible that these incidents went undocumented because Wright did not report them. Understandably, a mobility-impaired inmate—who must rely in large part on his fellow prisoners for basic assistance—may hesitate to report instances of neglect. It takes no imagination to conclude that making such a report would likely require identifying a less than responsive mobility aide which at worst could put Wright in danger and at best further inhibit future assistance. Wright testified as much, stating that he did not complain about the program because an

inmate "in [his] condition [could not] afford being labeled a snitch." Joint App'x at 189. In any event, whether the mobility assistance program functions in the manner that Wright describes is a question of fact to be determined at trial.

While it is true that allowing "a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial" in all discrimination actions, Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985), here—with the exception of a missed doctor appointment that appears to have been the result of a facility inmate count rather than shirking by mobility aides—DOCCS has provided no evidence contradicting any of Wright's examples of the mobility assistance program's shortcomings. Cf. id. at 997–98 (affirming summary judgment where testimony contained "numerous undisputed examples of inappropriate behavior exhibited [by the appellant]").

DOCCS and the district court rely on Mason v. Correctional Medical Services, Inc., 559 F.3d 880 (8th Cir. 2009), as an example of a court upholding as adequate for a disabled individual an accommodation comparable to the mobility assistance program. The facts of Mason, however, are easily distinguishable. The Eighth Circuit ruled that a state prison need not furnish

Mason, a blind inmate, with computer dictation software because there was no dispute that his prison-assigned reader provided him with "meaningful access to prison benefits." Id. at 887. Unlike Wright and the mobility aides, Mason was able to choose his reader, who "escort[ed] him everywhere he [went] and assist[ed] him with anything that he need[ed]." Id. Even though Mason did complain that his reader was not always available, Mason cited only one example of such unavailability. Id. Here, by contrast, the record viewed in the light most favorable to Wright demonstrates that mobility aides were often unavailable and certainly did not escort him everywhere, assisting him with everything he needed; in Franklin, moreover, Wright was not given a dedicated mobility aide.

Put simply, an examination of the record—with reasonable inferences drawn in Wright's favor—demonstrates that the mobility assistance program is fundamentally in tension with the ADA and RA's "emphasis on independent living and self-sufficiency[, which] ensures that, for the disabled, the enjoyment of a public benefit is not contingent upon the cooperation of third persons." Paulson, 525 F.3d at 1269; see Disabled in Action, 752 F.3d at 200 (upholding district court's grant of summary judgment to mobility and vision-impaired

voter plaintiffs against defendant-city board of elections because although plaintiffs "were ultimately able to cast their vote with the fortuitous assistance of others, the purpose of the Rehabilitation Act is 'to empower individuals with disabilities to maximize employment, economic self-sufficiency, *independence*, and inclusion and integration into society'" (quoting 29 U.S.C. § 701(b)(1))). While we are sensitive to the fact that prisons are unique environments with heightened security and safety concerns, see Pierce v. Cty. of Orange, 526 F.3d 1190, 1216–17 (9th Cir. 2008), because the ADA and RA "unmistakably" apply to State prisons and prisoners, Yeskey, 524 U.S. at 209, DOCCS is statutorily required to ensure that all of their inmates, including Wright, have the opportunity effectively to access the services and programs DOCCS provides.[1] Viewing the record through the lens we are required to employ, there remain disputes of fact as to whether the mobility assistance program is a plainly reasonable accommodation to meet Wright's needs. As a matter of law, it is not.

Even though we conclude that the mobility assistance program is not plainly reasonable as a matter of law, we may affirm a grant of summary

---

[1] To the extent that a prison's unique environment presents added costs for accommodating a disabled prisoner's proposed accommodation, this concern is properly evaluated under the burden shifting analysis below. See infra at 30–33.

judgment on any basis that finds "sufficient support in the record, including grounds not relied on by the district court." Lotes Co., Ltd. v. Hon Hai Precision Indus. Co., 753 F.3d 395, 413 (2d Cir. 2014) (internal quotation omitted). We thus consider further whether, "under the applicable burden [] shifting framework elaborated below," Wright's "proposed accommodation would have been reasonable." Dean, 804 F.3d at 189.

**2. Reasonableness of allowing Wright to use his motorized wheelchair**

We have not previously applied the ADA and RA burden shifting framework to a proposed reasonable accommodation in the prison context. However, we routinely employ this framework in the employment context, see Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 137–39 (2d Cir. 1995), and recently extended it to the educational context, see Dean, 804 F.3d at 190. Adopting the well-established ADA and RA burden shifting framework here, the plaintiff "bears the initial burdens of both production and persuasion as to the existence of an accommodation" that is "facial[ly] reasonable[]." Id. The burden of persuasion then shifts to the defendant to "rebut the reasonableness of the proposed accommodation." Id. "This burden of non-persuasion is in essence equivalent to the 'burden of showing, as an affirmative defense, that the

proposed accommodation would cause [the defendant] to suffer an undue hardship.'" Id. (quoting Borkowski, 63 F.3d at 138). We now apply this framework to determine whether Wright's requested accommodation—the use of his motorized wheelchair—would have been reasonable.

Wright faces only a "'light burden of production' as to the facial reasonableness of [his proposed] accommodation." Dean, 804 F.3d at 190 (internal quotation omitted). On this record, Wright has met that burden. It is undisputed that Wright lived a self-sufficient life with the aid of his motorized wheelchair for fifteen years prior to his incarceration. When he first entered DOCCS custody, a prison nurse determined that Wright has a "permanent limitation," and, he was allowed, on a temporary basis, to use his motorized wheelchair. Finally, Wright testified that, because of his cerebral palsy, he cannot turn his wrists sufficiently to operate a manual wheelchair. The evidence, therefore, supports the conclusion that a motorized wheelchair would allow Wright meaningful access to prison services, programs, and activities. Indeed, thirty state prison systems and the Federal Bureau of Prisons allow, at least on a case-by-case basis, mobility-impaired prisoners to use motorized wheelchairs.

We hold this to be persuasive evidence that Wright's request for a motorized wheelchair is a facially reasonable accommodation.

The burden of non-persuasion then falls to DOCCS to show that allowing Wright to use his motorized wheelchair would "impose undue hardship on the operation of [its] service[s], program[s], or activit[ies.]" Dean, 804 F.3d at 190. In arguing that DOCCS would be unduly burdened by allowing Wright to use his motorized wheelchair, DOCCS relies primarily on its policy of banning all motorized wheelchairs in its facilities. We hold that DOCCS's blanket ban on motorized wheelchairs violates the ADA and the RA because it precludes DOCCS from having to make an individualized assessment of a disabled inmate's particular needs. On the record before us, however, there is a dispute of material fact as to whether DOCCS, in this case, would suffer an undue hardship if it allowed Wright to use his motorized wheelchair in its facilities.

### a. Blanket Ban

The Supreme Court has held that Title III of the ADA requires that "an individualized inquiry must be made to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances . . . ." PGA Tour, Inc. v. Martin, 532 U.S. 661, 688 (2001). This is so

because the "refusal to consider [an individual's] personal circumstances in deciding whether to accommodate his disability runs counter to the clear language and purpose of the ADA." Id. Although Martin was decided in the context of Title III of the ADA, we conclude that the individualized inquiry requirement is applicable to failure to accommodate actions under Title II of the ADA as well.

"[T]he ADA was enacted to eliminate discrimination against *'individuals'* with disabilities." Id. (emphasis added). The ADA's legislative history, furthermore, makes evident that the ADA requires public entities to engage in an individualized inquiry before denying a disabled individual's proposed accommodation. The House Committee on Education and Labor's report on the ADA, states that, under Title III, public accommodations "are required to make decisions based on facts applicable to individuals." H.R. Rep. No. 101-485, pt. 2, at 102. Similarly, the Committee, in outlining the "[s]pecific forms of discrimination prohibited" under Title I, explained that employers "are required to make employment decisions based on facts applicable to individual applicants or employees, and not on the basis of presumptions as to what a class of individuals with disabilities can or cannot do." Id. at 58. In examining Title II,

the Committee strongly suggested that the individualized inquiry requirements of Title I and III also apply to Title II, stating "that the forms of discrimination prohibited by [Title II are] identical to those set out in the applicable provisions of titles I and III of this legislation." Id. at 84.

Since Martin, a number of courts have held that Title II requires public entities to engage in an individualized inquiry when determining whether an accommodation is reasonable. See Starego v. New Jersey State Interscholastic Athletic Ass'n, 970 F. Supp. 2d 303, 309 (D. N.J. 2013) ("While Martin's analysis concerned Title III of the ADA, its import, at least as to the individualized inquiry aspect of that decision, applies with equal force to Title II."); Cruz ex rel. Cruz v. Pa. Interscholastic Athletic Ass'n, Inc., 157 F. Supp. 2d 485, 498–99 (E.D. Pa. 2001) ("[I]n Martin, the Supreme Court made clear that a basic requirement of the ADA is the evaluation of a disabled person on an individual basis."); cf. Kapche v. City of San Antonio, 304 F.3d 493, 499 (5th Cir. 2002) (noting, in a Title I case, that "intervening Supreme Court cases consistently point to an individualized assessment mandated by the ADA under various sections of the Act."). More specifically, courts have applied an individualized inquiry requirement in the prison context. See Pierce v. District of Columbia, 128 F.

Supp. 3d 250, 254 (D.D.C. 2015) (finding that state denied a deaf prison inmate "meaningful access to prison services" where prison employees "did *nothing* to evaluate [plaintiff's] need for accommodation" and did not "engage in any meaningful assessment of his needs"). While these cases are not binding on this court, we find the reasoning underlying these decisions to be persuasive.

Requiring an individualized inquiry under Title II is also consistent with Title II's implementing regulations, which guide us "[i]n interpreting the statutory terms" of the ADA. Henrietta D., 331 F.3d at 273–74. For example, a public entity need not allow an "individual to participate in or benefit from the services, programs, or activities of that public entity" if it concludes, after "an individualized assessment," that the individual "poses a direct threat to the health or safety of others." 28 C.F.R. § 35.139. Similarly, "[a] public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities[; h]owever, [it] must ensure that its safety requirements are based on *actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities*." 28 C.F.R. § 35.130(h) (emphasis added).

Title II of the ADA, therefore, requires that once a disabled prisoner requests a non-frivolous accommodation, the accommodation should not be denied without an individualized inquiry into its reasonableness. Here, the record is clear that DOCCS has engaged in no such assessment. Instead, when denying Wright's request to use his motorized wheelchair, DOCCS relied on general safety and administrative concerns unconnected to Wright's specific situation. For example, Superintendent Kelly stated that because "the possession/use of a motorized wheelchair in a correctional setting includes numerous safety & security issues, Departmental policy is to preclude the use of such items by offenders." Joint App'x at 23. DOCCS did not evaluate Wright's actual motorized wheelchair. Nor did DOCCS perform an appraisal of Wright himself, i.e. there was no examination of his propensity to commit acts of violence, his disciplinary record, his past crimes, or his physical needs.[2] In short, DOCCS's reasons for rejecting Wright's accommodation—to be able to use his

---

[2] While DOCCS's Chief Medical Officer, Dr. Carl Koenigsmann, stated in a deposition and an affidavit that Wright's medical needs were being met because Wright was provided a manual wheelchair, a cushion, and a mobility aide, Koenigsmann testified that he never examined Wright or reviewed Wright's medical records. Joint App'x at 404, 411. Although there was, in some general respects, an examination of Wright's physical needs, it was by no means individualized as required under Title II of the ADA.

motorized wheelchair—were not responsive to Wright's specific request and individual circumstances.  As such the response was deficient and violated Title II of the ADA and Section 504 of the RA.

### b.  Dispute of Material Fact

In considering whether DOCCS has shown, as a matter of law, that it would be unduly burdened by allowing Wright the use of his motorized wheelchair, we are cognizant that prisons are unique environments where "deference to the expert views" of prison administrators is the norm.  Pierce, 526 F.3d at 1217.  In particular, administrators are well suited to determine whether an accommodation would undermine prison "security and order" or hinder facilities from "operating . . . in a manageable fashion."  Id. (quoting Bell v. Wolfish, 441 U.S. 520, 540 n. 23 (1979)); see also Crawford v. Indiana Dep't of Corr., 115 F.3d 481, 487 (7th Cir. 1997), *abrogated on other grounds by* Erickson v. Bd. of Governors of State Colls. & Univs. for Ne. Ill. Univ., 207 F.3d 945 (7th Cir. 2000) ("Terms like 'reasonable' and 'undue' are relative to circumstances, and the circumstances of a prison are different from those of a school, an office, or a factory, as the Supreme Court has emphasized in the parallel setting of prisoners' constitutional rights.").  Indeed, in the prison context we often exhibit judicial

restraint, "noting that courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." Giano v. Senkowski, 54 F.3d 1050, 1053 (2d Cir. 1995) (internal quotation omitted).

Here, however, Wright has presented evidence suggesting that the risks and costs of allowing him to use a motorized wheelchair are relatively low. To begin, Wright is not requesting that DOCCS incur financial costs by providing him with a motorized wheelchair—he has his own. Cf. Cade v. Williams, No. 5:14-cv-46 2014, WL 5529743, at *3 (E.D. Ark. Oct. 31, 2014) (finding blind prisoner failed to plead a plausible ADA claim where he was asking the prison system to teach him how to read Braille). Vail, a former Secretary for the Washington State Department of Corrections, moreover, testified that Wright's particular motorized wheelchair is relatively safe, requiring tools to access its battery and wiring. Even if the battery and wiring in Wright's motorized wheelchair were accessible, DOCCS already permits prisoners to use a number of electronic devices that have wires and batteries. This suggests that one of DOCCS's proffered security concerns—introducing potentially dangerous materials into the facility—may be overstated. As for whether the motorized wheelchair could be used to ram other inmates and staff, because Wright has no

history of behavioral problems while in custody, there is a basis from which to conclude that the risk of ramming is particularly low here.

DOCCS disputes all of this, presenting its own evidence that allowing Wright to use his motorized wheelchairs would be unduly burdensome. For example, DOCCS argues that motorized wheelchairs are quite heavy; thereby suggesting that even an inadvertent bump could result in injury to others. To the extent that the Franklin Facility, where Wright is currently located, has narrow hallways, the weight of his motorized wheelchair is of concern, and may pose a safety risk. Similarly, DOCCS argues that allowing Wright to use a motorized wheelchair will result in a number of administrative burdens, including frequent inspections of the device, requiring transportation to a technician for maintenance. These may be reasonable concerns and could, as a factual matter, inform the analysis of whether DOCCS is unduly burdened by Wright's use of his motorized wheelchair. To be clear, however, DOCCS may not rely upon general safety and security concerns to show that it is unduly burdened by Wright's request. In whatever evidentiary presentation it chooses to make before the district court on remand, DOCCS must proffer specific reasons why allowing Wright the use of *his* motorized wheelchair would be unduly burdensome.

A reasonable fact-finder could conclude that safety and administrative worries are sufficient bases to find in DOCCS's favor. But, a reasonable fact-finder could also find for Wright—determining that DOCCS would not be unduly burdened by allowing Wright the use of his motorized wheelchair. We therefore vacate the district court's grant of summary judgment in favor of DOCCS on Wright's ADA and RA claims and remand the case for further proceedings consistent with this opinion.

**3. Failure to Grieve**

We note that the district court granted DOCCS summary judgment on an alternative ground: because Wright "refused to engage in an interactive process" with DOCCS and failed adequately to grieve the mobility assistance program, Wright did not follow the underlying policy of the ADA such that granting injunctive relief was particularly inappropriate in this case. Wright, 2015 WL 5751064, at *16. We disagree with the district court's assessment in this regard. Wright did not refuse to engage with DOCCS in an interactive process. Rather, Wright informally complained to correction officers, and his counsel wrote four unanswered letters attempting to resolve the conflict prior to initiating litigation. On this record, it appears that DOCCS was well aware of Wright's issues with

the mobility assistance program but, as noted above, did not evaluate Wright's specific individual needs. DOCCS's failure to engage in an interactive process with Wright and his attorney is DOCCS's shortcoming, not Wright's. This lack of interactive process is no basis for granting summary judgment in favor of the defendants.

**CONCLUSION**

For the foregoing reasons, we vacate and remand for further proceedings consistent with this opinion.