[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-10359

Non-Argument Calendar

_____

ROY DAVID KINARD, III,

Plaintiff-Appellant,

*versus*

THE FLORIDA DEPARTMENT OF CORRECTIONS,
an agency of the state of Florida,
CENTURION OF FLORIDA, LLC,
SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
DOCTOR LLORENS,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 3:22-cv-00897-MMH-JBT

_____

Before WILSON, JILL PRYOR, and LUCK, Circuit Judges.

PER CURIAM:

Roy David Kinard, a Florida prisoner, fractured his foot while incarcerated. He sued under 42 U.S.C. § 1983, alleging that prison officials failed to provide him with adequate medical care. He also alleged that his injury left him disabled and unable to obtain meaningful access to the prison's programs and services, including recreational activities. The defendants included Dr. Asbelti Llorens Cordero, the prison doctor who treated Kinard, whom Kinard alleged was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Kinard also sued the Florida Department of Corrections, alleging that it violated the Americans with Disabilities Act ("ADA") as well as the Rehabilitation Act by failing to accommodate his disability. The district court concluded that Kinard failed to state a claim for relief and dismissed the action.

After careful review, we agree with the district court that Kinard failed to state a claim against Cordero under § 1983. But as to the ADA and Rehabilitation Act claims against the Department, we conclude that Kinard stated a claim for relief. The Department nevertheless asks us to affirm because Kinard failed to exhaust his

administrative remedies. Although the Department raised the exhaustion issue in the district court, the court did not notify Kinard that he had an opportunity to submit evidence regarding exhaustion. We remand the case so that the district court, after giving Kinard an opportunity to develop the record on exhaustion, may consider the Department's exhaustion defense. Accordingly, we affirm in part and vacate and remand in part.

## I.

On March 24, 2022, while incarcerated at Union Correctional Institution in Florida, Kinard allegedly slipped on a puddle of water and injured his left foot. Although he was able to get up after the fall, he was in serious pain. His foot began to swell and "turn to a blood red." Doc. 33 at 8.[1] Although corrections officers who worked on Kinard's housing unit knew about his injury, they did not seek any medical care for him.

Three days later, Kinard, who could barely walk, requested medical care. He was finally seen by a medical provider on April 7, two weeks after he was injured. When a nurse saw Kinard's black and red foot, she told him that his injury should have been treated as a medical emergency. The doctor on duty gave Kinard crutches and ibuprofen and said that his foot would be x-rayed.

Several days passed, but no x-rays were taken of Kinard's foot. On April 12, he again requested medical care. That day, he was seen by Cordero and a nurse. Cordero wrapped Kinard's foot

---

[1] "Doc." numbers refer to the district court's docket entries.

in an ace bandage and gave him a pass that allowed him to be on bed rest and use crutches for two weeks. A few days later, Kinard's foot was x-rayed.

After the x-rays were taken, Kinard heard nothing from the medical staff. On April 27, the pass allowing him to use crutches and remain on bed rest expired. He was required to return to work. To get to his job, he had to walk almost half a mile. Because of the walking, Kinard's foot swelled up, and he was in excruciating pain.

On May 18, more than a month after the x-rays were taken, Cordero saw Kinard for a second time. Cordero told him that the x-rays showed no fracture and only a minor sprain. Although Kinard complained that his foot remained swollen, inflamed, discolored, and painful, Cordero told him that the x-rays showed his foot was fine. Cordero refused to give him any pain medicine and said it was time for him to go back to work. Kinard's pain persisted. On May 31, he was brought to the prison's medical center for another round of x-rays.

Three days later, Cordero saw Kinard for a third time. Cordero told him that the new x-rays showed that his foot was fractured. Cordero explained that because of the delay in diagnosing the fracture, it would take at least six months for Kinard's foot to heal. Cordero told Kinard that he made a request for Kinard to be seen by an orthopedic surgeon but advised that "because of the time frame of the fracture there is nothing they can do." *Id.* at 11. Kinard asked for pain medication and a pass to miss work. Cordero refused these requests.

A week later, on June 10, Cordero saw Kinard for a fourth time. Cordero told him that he would be given an air cast and evaluated again in three to six weeks. Kinard asked why he had not seen an orthopedic surgeon. Cordero explained that he had consulted with an orthopedic surgeon who said that Kinard's fracture would heal with time.

Later that day, a nurse came to Kinard's dormitory with an air cast. The cast was uninflated, however, and the nurse did not bring an air canister with her. She promised Kinard that she would put air in his cast the following week. But the cast was not filled with air. Without being filled with air, the cast offered no support for Kinard's injured foot.

Around this time, Kinard requested a copy of his prison medical records. The records showed that Cordero had issued a series of passes directing that Kinard should pull or lift no more than 15 pounds and stand for no more than ten minutes. He also had directed that Kinard be given a lower bunk and an adaptive device. But until Kinard requested his medical records, he was not told about the passes and had not received the accommodations.

On July 8, Cordero saw Kinard for a fifth time. Cordero told him that his foot was not healing correctly and he needed to be seen by an orthopedic surgeon. Cordero prescribed ibuprofen. Kinard requested air for the cast, questioning "the point of having an air cast with no air," and suggested that the prison medical staff had "given him the air cast to cover their mistake." *Id.* at 13. Cordero did not respond to Kinard's question and comments.

After this appointment, Kinard continued to walk around the prison with an uninflated air cast. Although he continued to have difficulty walking, he was required to report to work. He was told that if he did not go to work, he "would be put in confinement." *Id.* at 14.

Approximately one month after his fifth appointment with Cordero, Kinard, proceeding *pro se*, filed suit in federal district court. He sued Cordero and the Department.[2]

In the operative complaint, Kinard brought a § 1983 claim against Cordero. He alleged that Cordero "exhibited deliberate[] indifference to [his] serious medical needs in violation of the Eighth Amendment" when Cordero "intentionally delayed . . . and refused to provide" treatment for his broken foot. *Id.* at 20.

He also brought claims against the Department for disability discrimination under the ADA and the Rehabilitation Act. He alleged that because his fractured foot substantially limited his daily activities, he was disabled for purposes of these statutes. And he alleged that because of the Department's failure to accommodate his disability, he had been denied meaningful access to the prison's services, programs, and activities, including his prison job, medical services, and "recreational activities in the prison yard." *Id.* at 16.

---

[2] Kinard also brought claims again Ricky Dixon, the Secretary of the Department, and Centurion of Florida, which was Cordero's employer. Because he does not raise any argument on appeal challenging the dismissal of his claims against Dixon and Centurion, we do not discuss these claims further.

Cordero and the Department filed motions to dismiss. Cordero argued that Kinard failed to state a claim for relief. According to Cordero, the allegations in the complaint did not establish that his conduct rose to the level of deliberate indifference because he provided medical care. This medical care included ordering x-rays of Kinard's foot, as well as giving him crutches, ibuprofen, an ace bandage, medical passes, and an air cast. Cordero said that Kinard's allegations, at most, showed that he was negligent and did not establish a constitutional violation.

The Department sought dismissal of the ADA and Rehabilitation Act claims on multiple grounds. First, it argued that the claims should be dismissed because Kinard failed to exhaust administrative remedies. Although Kinard had filed four formal grievances and four grievance appeals after injuring his foot, the Department argued that in these grievances and appeals he raised no allegation of disability discrimination. To support its exhaustion defense, the Department attached to its motion copies of Kinard's grievances and appeals.

Second, the Department asserted that Kinard failed to state a claim for relief under the ADA or the Rehabilitation Act. According to the Department, Kinard did not adequately allege that he was disabled because his allegations did not show that his medical condition substantially limited his participation in one or more life activities. The Department also argued that Kinard failed to allege facts showing that he was excluded from participating in any of its services, programs, or activities. Because Kinard had received

medical care, the Department reasoned, he could not show that he had been denied access to the prison's medical care programs or services. And to the extent Kinard alleged that the Department was liable under the ADA or the Rehabilitation Act because the medical care he received was inadequate, the Department argued, he failed to state a claim because he could not show that he received inadequate treatment because of his disability. The Department further asserted that the complaint made no allegations that Kinard had been denied access to any other service, program, or activity at the prison.

After receiving the Department's motion, the district court did not inform Kinard that he had an opportunity to submit evidence related to exhaustion.

The district court granted the motions to dismiss. As to Cordero, the court concluded that the complaint did not establish that he acted with deliberate indifference to Kinard's serious medical need. It explained that the allegations in the complaint showed that Cordero examined Kinard five times; ordered x-rays of his foot; and provided him with crutches, ibuprofen, an ace bandage, various medical passes, and an air cast. In addition, Cordero consulted with an orthopedic surgeon who told him that Kinard's injury would heal over time. Although Cordero did not discover the fracture until the second set of x-rays, the district court concluded that "Cordero's misreading of Kinard's first x-ray and delayed diagnoses demonstrate[d], at best, evidence of negligence or malpractice, not deliberate indifference." Doc. 60 at 14.

As to the Department, the court concluded that Kinard failed to state a claim for relief under the ADA or the Rehabilitation Act. It determined that Kinard failed to identify any "program or service to which he was denied access because of his injury." *Id.* at 22. The court characterized the disability discrimination claims as being premised "on a perceived refusal [of the Department] to provide [Kinard] adequate medical care for his foot injury." *Id.* But the court explained that "allegations that a defendant failed to provide medical care to a disabled inmate [did] not give rise to claims" under the ADA or the Rehabilitation Act. *Id.* Because the court concluded that Kinard failed to state a claim under the ADA or Rehabilitation Act, it did not address whether he had exhausted administrative remedies.

This is Kinard's appeal. On appeal, Kinard is represented by counsel.

## II.

We review *de novo* a district court's dismissal of a complaint with prejudice for failure to state a claim, "accept[ing] the factual allegations in the complaint as true, [and] construing them in the light most favorable to the plaintiff." *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019) (en banc). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). In addition, we liberally construe *pro se* litigants' pleadings, holding them "to less stringent standards than formal

pleadings drafted by lawyers." *Campbell v. Air Jam. Ltd.*, 760 F.3d 1165, 1168 (11th Cir. 2014).

### III.

On appeal, Kinard challenges the district court's dismissal of (1) his § 1983 deliberate indifference claim against Cordero and (2) his disability discrimination claims against the Department brought under the ADA and the Rehabilitation Act. We first address the deliberate indifference claim and then turn to the discrimination claims.

### A.

We begin with Kinard's deliberate indifference claim. The Eighth Amendment forbids the "inflict[ion]" of "cruel and unusual punishments." U.S. Const. amend. VIII. It prohibits government officials from exhibiting "deliberate indifference to [the] serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). For a defendant's actions to rise to the level of deliberate indifference, he must have acted with a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). To satisfy this standard, the defendant must have acted "with 'subjective recklessness as used in the criminal law.'" *Wade v. McDade*, 106 F.4th 1251, 1255 (11th Cir. 2024) (en banc) (quoting *Farmer*, 511 U.S. at 839).

To satisfy the subjective recklessness standard, the plaintiff must show that the defendant "was subjectively aware that his own conduct . . . put the plaintiff at substantial risk of serious harm." *Id.* at 1258. But "even if the defendant 'actually knew of a substantial

risk to inmate health or safety,'" he is not liable "if he 'responded reasonably to the risk.'" *Id*. at 1262 (quoting *Farmer*, 511 U.S. at 844–45). As we have explained, "a prison official who acts reasonably cannot be found liable." *Id*. at 1257 (alterations adopted) (quoting *Farmer*, 511 U.S. at 845).

Here, we conclude that the allegations in the complaint fail to state a claim for deliberate indifference because they do not show that Cordero's conduct rose to the level of subjective recklessness. The relevant risk created by Cordero's conduct was the harm that could arise if Kinard's injured foot was not treated. Cordero did not act recklessly because he reasonably responded to this risk. As the complaint shows, over the course of several visits, he tried to treat Kinard's injury. He took multiple x-rays; consulted with an orthopedist; and prescribed crutches, an air cast, ibuprofen, and bed rest.[3] Because the complaint does not establish that Cordero acted with subjective recklessness, we agree with the district court that Kinard failed to state a claim for relief.

In arguing that he stated a claim for relief, Kinard points to our decision in *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999). In

---

[3] The allegations in the complaint show that Cordero not only prescribed Kinard a two-week pass for bed rest but also directed that he should receive other accommodations including limitations on pulling, lifting, and standing. On appeal, Kinard argues that we should not consider these accommodations because prison staff failed to inform him of them, and he learned of them only after receiving a copy of his medical records. But Kinard fails to explain how the prison staff's failure to implement Cordero's directions shows that Cordero was deliberately indifferent.

that case, an inmate in a local jail repeatedly complained over a five-month period about excruciating pain, nausea, weight loss, and vomiting. *Id.* at 1252–54. His requests were often ignored. *Id.* When he did see a doctor, he was prescribed an anti-gas medication that was ineffective. *Id.* The doctor later prescribed another stomach medication, which also did not improve the inmate's condition. *Id.* at 1253. When the inmate finally was taken to a hospital, it was estimated that his medical care would cost approximately $10,000. *Id.* at 1254. At that point, he was prematurely released from jail. *Id.* Days after his release, the inmate was diagnosed with terminal colon cancer. *Id.*

Although the doctor's failure to diagnose the colon cancer was not a constitutional violation, we reversed the grant of summary judgment. *Id.* at 1256. Because the doctor "knew the extent of [the inmate's] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [his] condition," we concluded that a reasonable jury could have found that the doctor was deliberately indifferent to the inmate's serious medical need. *Id.* at 1257–58. In reaching this conclusion, we described the treatment provided to the inmate as "so cursory as to amount to no care at all." *Id.* at 1257.

Even after considering *McElligott*, we cannot say that the allegations in the complaint established that Cordero acted with deliberate indifference. Over the course of five visits, he treated Cordero's injured foot in a variety of ways. We are not persuaded that this is a case where the treatment provided was so cursory that

it amounted to no care at all. Because Kinard failed to state a claim for deliberate indifference, we affirm the district court's dismissal of the § 1983 claim against Cordero.

**B.**

We now turn to Kinard's ADA and Rehabilitation Act claims against the Department. The ADA prohibits discrimination "against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to any discrimination by any such entity." *Id.* § 12132.

Section 504(a) of the Rehabilitation Act is "pretty much identical" to Title II of the ADA. *Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1133 (11th Cir. 2019). It provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

"Given the textual similarities between the two statutes, the same standards govern claims under both, and we rely on cases construing Title II and § 504 interchangeably." *Silberman*, 927 F.3d at 1133 (alterations adopted) (internal quotation marks omitted). "In other words, whatever we have said . . . about Title II goes for § 504, and vice versa." *Id.* at 1133–34.

To state a claim for disability discrimination under Title II of the ADA or § 504 of the Rehabilitation Act, a plaintiff must allege that (1) he is a "qualified individual with a disability"; (2) "he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity"; and (3) "the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." *Id.* at 1134 (internal quotation marks omitted). A prisoner has a claim for disability discrimination if he is denied, by reason of his disability, participation in an activity provided in a state prison. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 211–12 (1998).

Kinard's complaint can be construed as raising two theories of disability discrimination under Title II of the ADA and § 504 of the Rehabilitation Act. Under the first theory, the Department allegedly engaged in disability discrimination because Kinard was a disabled individual and the prison failed to provide him with adequate medical care. Under the second theory, the Department allegedly engaged in disability discrimination because its failure to accommodate Kinard's disability due to his injured foot left him unable to access programs or activities offered by the prison, such as recreation time.

As to the first theory, Kinard failed to state a claim for relief. We agree with the district court that, absent something more, "allegations that a defendant failed to provide medical care to a disabled inmate do not give rise to claims" under Title II or § 504. Doc. 60 at 22. These statutes do not provide a "remedy for medical

malpractice" and are not "violated by a prison's simply failing to attend to the medical needs of its disabled prisoners." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1294 (11th Cir. 2005) (en banc) (quoting *Bryan v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996)).

On appeal, Kinard focuses on the second theory—that he suffered disability discrimination because the Department failed to accommodate his disability, which left him without meaningful access to the prison's programs and activities. The Department argues that Kinard failed to state a claim because the complaint included no allegation he was excluded from any service or program because of his disability.

We disagree. After all, the complaint alleged that Kinard was disabled because of his injured foot and that due to this disability and the lack of any accommodation, Kinard was unable "to participate in recreational activities in the prison yard." Doc. 33 at 16. Admittedly, Kinard's complaint is not a model of clarity. But given the liberal construction that we afford *pro se* pleadings, *see Campbell*, 760 F.3d at 1168, we conclude that he stated claims under Title II and § 504. *See Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 72–73 (2d Cir. 2016) (holding that prison engaged in disability discrimination under Title II when prisoner introduced evidence that he had been "denied meaningful access to prison services, programs, and activities").

Even though Kinard stated claims for disability discrimination, the Department urges us to affirm the dismissal of the claims against it on the alternative ground that Kinard failed to exhaust

administrative remedies. Given the record before us, we cannot decide the exhaustion issue.

Under the Prison Litigation Reform Act, a prisoner generally must exhaust administrative remedies before filing a lawsuit. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought under section 1983 of this title, or any other Federal law, by a prisoner . . . until such administrative remedies as are available are exhausted."). Although a defense that a prisoner failed to exhaust administrative remedies is non-jurisdictional, we have recognized that it is "a precondition to an adjudication on the merits" and have described it as a "matter in abatement." *Bryant v. Rich*, 530 F.3d 1368, 1374 (11th Cir. 2008). An exhaustion defense "should be raised in a motion to dismiss." *Id.* at 1375 (internal quotation marks omitted). When a defendant raises exhaustion at the motion-to-dismiss stage, a district court may "consider facts outside of the pleadings" and "resolve factual disputes." *Id.* at 1376. But before a court may look to facts outside the pleadings, it must give the parties a "sufficient opportunity to develop a record." *Id.* We thus have explained that before a court "looks beyond the pleadings to a factual record," it must be sure that "the plaintiff [had] fair notice of his opportunity to develop a record." *Id.* at 1376 n.14 (alteration adopted) (internal quotation marks omitted).

If the plaintiff received an opportunity to develop the record, the district court then applies a two-part test to determine whether the plaintiff exhausted his administrative remedies. *See Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir. 2008). First, it looks to the

factual allegations in the defendant's motion and the plaintiff's response, taking the plaintiff's version of the facts as true to the extent it conflicts with the defendant's version. *Id.* If the complaint is not subject to dismissal at this step, the court then must make specific findings to resolve the parties' factual disputes and determine whether the defendant bore its burden of proving that the plaintiff failed to exhaust administrative remedies. *Id.*

Here, the Department maintains that Kinard failed to exhaust his administrative remedies. Although Kinard filed four formal grievances and four appeals, the Department argues that in these submissions he never raised any issue regarding disability discrimination and instead complained only about the quality of the medical care he received.

Given the record before us, we cannot decide the exhaustion issue. Here, after the Department raised the exhaustion issue in its motion to dismiss and attached additional materials, the court did not notify Kinard, a *pro se* litigant, that he had an opportunity to develop the record on exhaustion. Because Kinard never received notice of his opportunity to develop the record, we cannot address the Department's exhaustion argument. *See Bryant*, 530 F.3d at 1376 n.14. On remand, after giving Kinard an opportunity to develop the record, the district court should then decide whether he exhausted administrative remedies.

## IV.

For the above reasons, we affirm the district court's dismissal of Kinard's § 1983 claim against Cordero. But we vacate the district

court's dismissal of his ADA and Rehabilitation Act claims against the Department. As to those claims, we remand for further proceedings.

**AFFIRMED IN PART, VACATED AND REMANDED IN PART.**